EDMUND E. KRAUTER ET AL., APPELLEES AND CROSS-APPELLANTS, v. LOWER BIG BLUE NATURAL RESOURCES DISTRICT, A BODY POLITIC AND CORPORATE, APPELLANT AND CROSS-APPELLEE.

259 N. W. 2d 472

Filed November 16, 1977. No. 41117.

Everson, Noble, Wullschleger, Sutter & Fischer, for appellant.

Asa A. Christensen of Christensen Law Offices and Joseph T. Vosoba of Steinacher & Vosoba, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

McCOWN, J.

This is a condemnation action in which the condemner, Lower Big Blue Natural Resources District, sought to condemn the fee title to 320 acres of farmland in Gage County, Nebraska, for the purpose of constructing, operating, and maintaining a detention-type flood control dam. The appraisers appointed by the county court appraised the property at $153,560, and the condemnee owners, Edmund E. and Neva M. Krauter, appealed to the District Court. The District Court found that the only public purpose for the condemnation was the construction and maintenance of the detention-type dam; that such a public purpose required only 140.68 acres;

and that the evidence introduced did not establish that it was reasonably necessary to acquire a fee title to the 140.68 acres rather than an easement. The District Court thereupon dismissed the action. The condemner has appealed.

The condemner, Lower Big Blue Natural Resources District, came into existence on July 1, 1972. See, generally, §§ 2-3201, R. R. S. 1943, et seq. The district included portions of Gage, Saline, Jefferson, and Pawnee counties. The condemner assumed the assets, liabilities, and programs of several predecessor organizations, including the Clatonia Creek Watershed Conservancy District. The Clatonia district, in 1966, had adopted a work plan for flood prevention and erosion control within its boundaries. Included in the plan was the floodwater retention dam proposed to be located on the condemnees' land. That structure was designated as structure 3-A and called for 140.68 acres of condemnees' land for the structure and its related permanent and flood pools. The dam and spillway required approximately 14 acres, the permanent pool 46 acres, and the flood pool about 81 acres. The plan designated its purpose to be the prevention of flooding and soil erosion. The plan did not contemplate or provide for any recreational or other public use of structure 3-A.

In October 1973, the condemner wrote to the condemnees advising them that it would begin negotiations within 90 days to obtain "land rights involving 140.68 acres." They were also informed of a public hearing on the project, which they attended on October 23, 1973. The only purpose for structure 3-A and related pools discussed was flood control. On February 25, 1974, an agent of the condemner made an offer to the condemnees for an easement on the 140.68 acres, which was rejected. The condemner had the land appraised for purposes of an easement on 140.68 acres and damages to the remainder, and,

in the alternative, for acquisition of a fee title to the entire 320 acres. On July 3, 1974, the condemner commenced negotiations with the condemnees to acquire a fee title to the entire 320 acres. An offer was made, and later increased, but the offers were not accepted. This condemnation action was commenced on December 3, 1974.

The petition set forth that the condemner was organized and responsible for, and in the process of, developing and executing plans and programs for some of the purposes set forth in sections 2-3201 to 2-3261, R. R. S. 1943; that such plans and programs required the construction and maintenance of a detention-type dam designated as site 3-A on the land of the condemnees and made it necessary that a fee title to the 320 acres of condemnees' land be acquired "for the purpose of or in connection with construction, operation, maintenance and inspection of a detention-type dam, designated as Site 3-A in the plans for Clatonia Creek Watershed Conservancy District." Appraisers were appointed in the county court and reported and fixed the value of the fee title to the 320 acres of condemnees' land at $153,560.

The condemnees appealed to the District Court. Their petition alleged in substance that the taking was not for a public purpose; was beyond the needs of the condemner; the condemner intended to subsequently resell the land; and, finally, that the amount was inadequate. Following extended discovery and a pretrial conference, trial was had to the court on March 15, 1976, on the issue of whether the condemnation was for a public purpose. The issue of damages was not considered. There was evidence that the first time the condemner took any official action which indicated any prospective public use other than flood control for the site involved here was on July 31, 1975. On that date the condemner adopted 1 and 6-year plans which provided that for fiscal year 1976 condemner would investigate the feasibility of

using the water stored by structure 3-A as municipal water supply to the Village of Clatonia, and initiate studies for use of structure 3-A waters for public recreation; and in subsequent fiscal years developing and carrying out such plans as might be adopted.

The District Court found that the only public purpose for the condemnation of the dam site was flood and erosion control; that such a public purpose required only 140.68 acres; and that the evidence introduced did not establish that it was reasonably necessary to acquire a fee title to the 140.68 acres, rather than an easement. The District Court also found that before condemnation proceedings are commenced, a condemner must determine by some appropriate action which permissible public uses it intends to implement by the taking and set them out in its pleadings. The court also found that the condemner cannot justify a taking by a subsequent adoption of public purposes not adopted or pleaded when the action was instituted and requiring other land and rights. The District Court thereupon dismissed the action and this appeal followed.

In this case the evidence is undisputed that only 140.68 acres of the condemnees' farm was actually needed for the purpose of constructing the dam and pooling areas for flood and erosion control. The remaining 179.32 acres was excess land which was not needed for flood control purposes. The condemner contends that the excess land was being acquired for possible future public use. The condemnees contend that the land was not being acquired for any public purpose or use, but, instead, was being acquired solely to produce a profit from a subsequent sale of the land, and thus defraud the condemnees.

Section 2-3229, R. R. S. 1943, provides in part: "The purposes of natural resources districts shall be to develop and execute, through the exercise of powers and authorities contained in this act, plans, facilities, works and programs relating to (1) ero-

sion prevention and control, (2) prevention of damages from flood water and sediment, (3) flood prevention and control, * * * (5) water supply for any beneficial uses * * * (10) development and management of fish and wildlife habitat, (11) development and management of recreational and park facilities, and * * *.  All such plans and programs are to be in conformance with the goals, criteria and policies of the state water plan as developed by the Nebraska Natural Resources Commission; * * *."  Under this section, plans and programs for development and management of fish and wildlife habitat and recreational and park facilities must be in conformance with the fish and wildlife plan for Nebraska as developed by the Game and Parks Commission.  Such plans and programs must be approved in writing by the Game and Parks Commission prior to their adoption or development.

Section 2-3234, R. R. S. 1943, provides in part: "Each district shall have the power and authority to exercise the power of eminent domain when necessary to carry out the purposes of this act within the limits of the district or outside its boundaries.  Exercise of eminent domain shall be governed by the provisions of sections 76-704 to 76-724; * * *."  Section 76-714, R. R. S. 1943, provides: "The interest in the property acquired by the condemner shall be such title, easement, right-of-way, or use as is expressly specified in or necessarily contemplated by the law granting to the condemner the right to exercise the power of eminent domain.  The condemner shall not dispossess the condemnee until the condemner is ready to devote the property to a public use, and such title or interest as the condemner seeks to acquire shall not be complete until the property is put to the public use for which taken."

It is beyond dispute that private property can be taken by the exercise of the power of eminent domain only for a public use.  The rule is well estab-

lished in this state that a condemner can take no more property than the public use requires. Carter v. State, 198 Neb. 519, 254 N. W. 2d 390. In Burnett v. Central Nebraska Public Power & Irr. Dist., 147 Neb. 458, 23 N. W. 2d 661, this court said: " ' * * * no more property can be taken than the public use requires; this rule applies both to the amount of property and the estate or interest in such property to be acquired by the public. * * *.' "

In cases involving an attempt to acquire an amount of land in excess of that actually needed for a particular public improvement, the authorities uniformly follow the principle that the power of condemnation may not be used to condemn property in excess of that needed for public purposes. See, Annotation, "Right to condemn property in excess of needs for a particular public purpose." 6 A. L. R. 3d 297.

The power of eminent domain may be exercised only on the occasion and in the mode or manner prescribed by the Legislature, and statutes conferring and circumscribing such power must be strictly construed. See, State ex rel. Nelson v. Butler, 145 Neb. 638, 17 N. W. 2d 683; Higgins v. Loup River Public Power Dist., 157 Neb. 652, 61 N. W. 2d 213.

The condemner argues that it has the power to condemn property for public purposes, if there is a probability, or even a possibility, that it might be needed and used for a public purpose in the future. We cannot agree.

Under the statutes governing the exercise of the power of eminent domain by natural resources districts a condemning agency must have a present plan and a present public purpose for the use of the property before it is authorized to commence a condemnation action. Section 76-714, R. R. S. 1943, specifically provides that a condemning agency shall not "dispossess" the condemnee until the condemner is ready to devote the property to a public use. Dispossess means "to oust from land by legal

process; to eject, to exclude from realty." Black's Law Dictionary (4th Ed). The Legislature has clearly limited the exercise of the power of eminent domain by a natural resources district to situations in which the condemning agency has a present plan and a present public purpose for the use of the property to be acquired. The possibility that the condemning agency at some future time may adopt a plan to use the property for a public purpose is not enough to justify a present condemnation.

The condemner contends that it is not required to plead or prove the specific public purpose for which the excess land is being condemned. It takes the position that the general allegation that it has the power of condemnation for the various purposes set out in the statute, and that the land is needed for those purposes, is sufficient. The condemner's position, in effect, is that general allegations of public purpose and necessity are not subject to the challenge, and the condemner is not required to allege or prove the particular public purposes for which the property is to be condemned and used. We disagree. The condemnation statute contemplates that a condemning agency shall establish by the pleadings its right to exercise the power of eminent domain to take the particular property sought to be condemned.

Section 76-714, R. R. S. 1943, provides "such title or interest as the condemner seeks to acquire shall not be complete until the property is put to the use for which taken." Section 2-3229, R. R. S. 1943, requires that any plan for the development and management of fish and wildlife habitat or recreational and park facilities must be approved in writing by the Game and Parks Commission prior to its adoption or development by the natural resources district. The right to exercise the power of eminent domain for those particular purposes might well be difficult to determine in the absence of specific pleadings and proof.

In Burnett v. Central Nebraska Public Power & Irr. Dist., *supra*, this court said: " ' * * * the right of eminent domain gives to the Legislature the control of private property for public uses, and for public uses only. * * * This being the rule, the property must be used for the purpose which justified its taking, otherwise it would be a fraud on the owner and an abuse of power, and the authority being in derogation of private right, is to be strictly construed.' "

The landowner's right to own, possess, and enjoy his property free from an unlawful and unconstitutional exercise of the sovereign power of eminent domain may best be insured by requiring specific pleadings and proof. We hold that in a condemnation action under the power of eminent domain, the condemner must allege the specific public purposes for which the condemner seeks to acquire and use the property sought to be taken.

In a condemnation case issues as to the amount of property needed and the estate or interest in such property are questions of fact for the court. Burnett v. Central Nebraska Public Power & Irr. Dist., *supra*. Likewise, issues as to what constitutes a public use and whether a taking is lawful are judicial issues for the court. Burger v. City of Beatrice, 181 Neb. 213, 147 N. W. 2d 784. In the case at bar the court made findings on those issues, and there is evidence in the record to support those findings.

The condemnees, on cross-appeal, contend that the allowances of attorneys' fees and costs were insufficient. The condemnees were represented by additional counsel in the appeal to the District Court. Although no separate allowance was set out for county court fees, the court obviously was concerned with eliminating duplication of fees. A trial court ordinarily has a better opportunity for a practical appraisal of the value of legal services in a case. An appellate court will interfere with the trial court's allowance of attorneys' fees only to correct a

patent injustice where the allowance is clearly excessive or insufficient. Junker v. Junker, 188 Neb. 555, 198 N. W. 2d 189.

The judgment of the District Court was correct in all respects and is affirmed. Condemnees' are allowed the sum of $1,500 for the services of their attorneys in this court.

AFFIRMED.