## CONCLUSION

We conclude that the cumulative errors of failing to comply with the provisions of § 27-513, the continued questioning of Nancy after she refused to testify, and the trial court's refusal to either admonish or instruct the jury not to draw an inference from the invocation of the privilege constitute reversible error. Because the evidence presented by the State was sufficient to sustain Draper's convictions, we reverse the convictions and remand the cause for a new trial.

Reversed and remanded for a new trial.

---

Randy Thompson et al., appellees and cross-appellants,
v. Dave Heineman, in his official capacity as
Governor of the State of Nebraska, et al.,
appellants and cross-appellees.

___ N.W.2d ___

Filed January 9, 2015.    No. S-14-158.

1. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
2. **Judgments: Jurisdiction.** A jurisdictional question which does not involve a factual dispute presents a question of law.
3. **Constitutional Law: Statutes.** The constitutionality of a statute presents a question of law.
4. **Standing: Jurisdiction: Parties.** Standing is a jurisdictional component of a party's case. Only a party that has standing—a legal or equitable right, title, or interest in the subject matter of the controversy—may invoke the jurisdiction of a court or tribunal.
5. **Standing: Proof.** Common-law standing usually requires a litigant to demonstrate an injury in fact that is actual or imminent.
6. **Taxation: Standing.** Taxpayer standing is an exception to the injury-in-fact requirement for standing.
7. **Actions: Taxation: Injunction.** A resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes.
8. **Taxation: Standing: Public Purpose.** As a limited exception to the injury-in-fact requirement for standing, taxpayers may raise a matter of great public concern.
9. **Mandamus: Public Purpose.** The "great public concern" exception is another name for the "public interest" exception in early mandamus cases to enforce a public right.

10. **Actions: Taxation: Standing: Public Purpose.** In taxpayer actions raising a matter of great public concern, there is no requirement that the taxpayer show the alleged unlawful act would otherwise go unchallenged because no other potential party is better suited to bring the action.

11. **Constitutional Law: Statutes: Presumptions.** A court presumes that statutes are constitutional and will not strike down a statute unless its unconstitutionality is clearly established.

12. **Constitutional Law: Administrative Law: Public Service Commission.** The Public Service Commission is not a statutorily created state agency. It is an independent regulatory body for common carriers created by Neb. Const. art. IV, § 20.

13. **Public Service Commission.** The Public Service Commission has independent legislative, judicial, and executive or administrative powers over common carriers, which powers are plenary and self-executing. Absent specific legislation, the commission's enumerated powers over common carriers are absolute and unqualified.

14. **Constitutional Law: Legislature: Public Service Commission.** In any field where the Legislature has not acted, the Nebraska Constitution authorizes the Public Service Commission to exercise its plenary powers over common carriers.

15. ____: ____: ____. Under Neb. Const. art. IV, § 20, the Legislature can restrict the Public Service Commission's plenary powers only through specific legislation.

16. **Constitutional Law: Legislature: Public Service Commission: Jurisdiction: Words and Phrases.** Under Neb. Const. art. IV, § 20, the term "specific legislation" means specific restrictions. It does not include general legislation to divest the Public Service Commission of its jurisdiction and transfer its powers to another governmental entity or official besides the Legislature.

17. **Constitutional Law: Legislature: Public Service Commission: Jurisdiction.** Under Neb. Const. art. IV, § 20, the Legislature can divest the Public Service Commission of jurisdiction over a class of common carriers by passing specific legislation that occupies a regulatory field, thereby preempting the commission's control.

18. ____: ____: ____: ____. Under Neb. Const. art. IV, § 20, if the Legislature passes specific legislation to divest the Public Service Commission of jurisdiction in a regulatory field, the Legislature cannot abandon control over the common carriers in that field. Regulatory control over common carriers must reside either in the commission or in the Legislature.

19. **Constitutional Law: Legislature: Public Service Commission.** Unless the Legislature enacts legislation to specifically restrict the Public Service Commission's authority and retains control over that class of common carriers, it cannot constitutionally deprive the commission of its regulatory powers.

20. ____: ____: ____. The Public Service Commission's constitutional authority to regulate "common carriers" is limited to the common-law meaning of that term unless the Legislature has authorized the commission to exercise control over carriers that are outside of that meaning.

21. **Words and Phrases.** A carrier refers to an individual or organization that contracts to transport passengers or goods for a fee. The common law recognizes only two types of carriers: common carriers and private carriers.

22. **Contracts: Words and Phrases.** A private carrier is one that, without being in the business of transporting for others or holding itself out to the public as willing to do so, undertakes only by special agreement to transport property, either gratuitously or for a consideration.

23. **Public Purpose: Words and Phrases.** Any person, corporation, or association holding itself out to the public as offering its services to all persons similarly situated and performing as its public vocation the services of transporting passengers, freight, messages, or commodities for a consideration or hire, is a common carrier in the particular spheres of such employment.

24. **____: ____.** A carrier is a common carrier if its vocation is of a public nature, although limited to the transportation of certain classes or kinds of freight, and it may be of service to a limited few who by their peculiar situation or business may have occasion to employ it. Transporting commodities for others is a vocation of a public nature even if the service is not available to the public at large.

25. **Oil and Gas: Words and Phrases.** An oil pipeline carrier is a common carrier if it holds itself out as willing to transport oil products for a consideration to all oil producers in the area where it offers its transportation services.

26. **Constitutional Law: Statutes: Proof.** A plaintiff can succeed in a facial challenge only by establishing that no set of circumstances exists under which the act would be valid, i.e., that the law is unconstitutional in all of its applications.

27. **Oil and Gas: Legislature: Intent.** Neb. Rev. Stat. § 75-501 (Reissue 2009) does not define the whole field of pipeline common carriers. Its historical context shows that the Legislature intended only to ensure that intrastate carriers are regulated.

28. **Constitutional Law: Courts: Public Service Commission.** A court liberally construes the constitutional provision creating the Public Service Commission and delineating its powers.

29. **Constitutional Law: Statutes.** A canon of statutory construction must yield to constitutional requirements governing the same subject matter.

30. **Public Utilities: Rates.** The public nature of a corporate utility's operations and the public franchise that authorizes its operations justify government regulation of its rates.

31. **Eminent Domain.** The reason common carriers can exercise the right of eminent domain lies in their quasi-public vocation of transporting passengers or commodities for others.

32. **Constitutional Law: Eminent Domain: Taxation: Public Purpose.** A citizen's property may not be taken against his or her will, except through the sovereign powers of taxation and eminent domain, both of which must be for a public purpose.

33. **Eminent Domain: Public Purpose: Words and Phrases.** Eminent domain is the State's inherent power to take private property for a public use.

34. **Constitutional Law: Eminent Domain: Legislature: Statutes.** The State's eminent domain power resides in the Legislature and exists independently of the Nebraska Constitution. But the constitution has limited the power of eminent domain, and the Legislature can limit its use further through statutory enactments.

35. **Constitutional Law: Eminent Domain: Public Purpose.** Under Neb. Const. art. I, § 21, the State can take private property only for a public use and only if it pays just compensation.

36. **Eminent Domain: Legislature.** Only the Legislature can authorize a private or public entity to exercise the State's power of eminent domain.

37. **Eminent Domain: Legislature: Public Purpose.** Because a common carrier performs a public transportation service, the Legislature can grant it the sovereign power to take private property for a public use and the State can control its operations, to the extent that the regulation is not precluded by federal law.

38. **Constitutional Law: Property.** The Nebraska Constitution prohibits the taking of private land for a private purpose.

39. **Constitutional Law: Eminent Domain: Public Purpose: Oil and Gas.** Under the Nebraska Constitution's limitation on the power of eminent domain, common carriers can take private property only for a public use. That minimally means that a pipeline carrier must be providing a public service by offering to transport the commodities of others who could use its service, even if they are limited in number.

40. **Constitutional Law: Public Service Commission: Oil and Gas.** The Public Service Commission's constitutional powers over common carriers include routing decisions for pipeline common carriers.

Appeal from the District Court for Lancaster County: STEPHANIE F. STACY, Judge. Judgment vacated.

Jon Bruning, Attorney General, Katherine J. Spohn, Ryan S. Post, and Blake E. Johnson for appellants.

David A. Domina, Brian E. Jorde, and Megan N. Mikolajczyk, of Domina Law Group, P.C., L.L.O., for appellees.

Richard Klingler, Kathleen Mueller, and Lauren C. Freeman, of Sidley Austin, L.L.P., and James G. Powers and Patrick D. Pepper, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for amicus curiae TransCanada Keystone Pipeline, LP.

HEAVICAN, C.J., CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ., and RIEDMANN, Judge.

Connolly, J.
## I. NATURE OF THE DECISION

The State appeals from the district court's judgment that determined L.B. 1161,[1] which the Legislature passed in 2012, was unconstitutional.

Neb. Const. art. V, § 2, in relevant part, requires that a supermajority of this court's members concur before it can strike down legislation as unconstitutional: "No legislative act shall be held unconstitutional except by the concurrence of five judges."

Four judges of this court have determined that the appellees (the landowners), who challenged the constitutionality of L.B. 1161, have standing to raise this issue and that the legislation is unconstitutional. Three judges of this court conclude that the landowners lacked standing and decline to exercise their option to address the constitutional issues.

The majority's opinion that the landowners have standing controls that issue. But because there are not five judges of this court voting on the constitutionality of L.B. 1161, the legislation must stand by default. Accordingly, we vacate the district court's judgment.

The following judges are of the opinion that the landowners have standing and that the challenged legislation is unconstitutional: Justices Connolly, McCormack, and Miller-Lerman, and Judge Riedmann.

## II. SUMMARY

L.B. 1161 allows "major oil pipeline" carriers to bypass the regulatory procedures of the Public Service Commission (PSC). As an alternative to obtaining approval from the PSC—a constitutional body charged with regulating common carriers—L.B. 1161 permits these pipeline carriers to obtain approval from the Governor to exercise the power of eminent domain for building a pipeline in Nebraska. The district court ruled that the Legislature had unconstitutionally divested the PSC of its regulatory authority over common carriers. On appeal, the

---

[1] 2012 Neb. Laws, L.B. 1161.

State contends that the landowners lacked standing to sue and that L.B. 1161 is constitutional.

## III. BACKGROUND

L.B. 1161 has its origins in the controversial Keystone XL oil pipeline proposed in 2008 by TransCanada Keystone Pipeline, LP (TransCanada). TransCanada wanted to construct its pipeline to carry crude oil products from Canada to the Texas coastline. By executive order, the construction of a pipeline that crosses an international border requires a permit from the President of the United States.[2] Executive Order No. 13337 delegates to the U.S. Secretary of State the authority to "receive all applications for Presidential permits . . . for the construction, connection, operation, or maintenance, at the borders of the United States, of facilities for the . . . exportation or importation of petroleum [or] petroleum products . . . to or from a foreign country."[3] In 2008, TransCanada applied for a presidential permit to construct its proposed pipeline.

As originally proposed, the pipeline would have passed directly through Nebraska's Sandhills, raising considerable public concern about environmental damage to a sensitive ecosystem and the region's high water table. In 2008, the statute that governs eminent domain power for oil pipelines imposed no standards on carriers for the right to exercise eminent domain power.[4] In October 2011, the Governor called a special session of the Nebraska Legislature to determine whether siting legislation could be enacted.

### 1. Legislative Background

In the 2011 special session, the Legislature amended § 57-1101 by enacting L.B. 1, a legislative bill called the Major Oil Pipeline Siting Act (MOPSA).[5] MOPSA required

---

[2] See, Exec. Order No. 13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004); Exec. Order No. 11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968).

[3] See Exec. Order 13337, *supra* note 2, § 1(a).

[4] See Neb. Rev. Stat. § 57-1101 (Reissue 2010).

[5] See 2012 Neb. Laws, L.B. 1, § 2, 1st Spec. Sess.

a major oil pipeline carrier to apply for and obtain approval from the PSC before it could exercise eminent domain power to build a pipeline.[6] Section 5(2) of MOPSA defines a major oil pipeline as a pipeline larger than 6 inches in diameter that is built to transport any petroleum product "within, through, or across Nebraska."[7]

In passing MOPSA, the Legislature recognized[8] that federal law preempts state regulation of safety issues related to oil pipelines.[9] But it asserted the State's authority to regulate the siting of pipelines to protect the economic and aesthetic value of Nebraska's land and natural resources.[10] In determining whether to approve a proposed route, MOPSA required the PSC to consider several economic, environmental, and social factors, including whether another corridor could be feasibly and beneficially used.[11] Two of MOPSA's stated purposes were to ensure the protection of Nebraskans' property rights and the State's natural resources.[12] The Legislature did not appropriate funds to the PSC to carry out these duties. Instead, MOPSA authorized the PSC to assess the costs of its regulatory investigation and the application process to the applicant.[13] It set out an appeal process for any party aggrieved by the PSC's final order.[14] The Legislature enacted MOPSA with an emergency clause so that it became effective on November 23, 2011.[15]

---

[6] *Id.*, § 1.

[7] See *id.*, § 5(2) (codified at Neb. Rev. Stat. § 57-1404(2) (Cum. Supp. 2014)).

[8] *Id.*, §§ 3(2) and 4(1) (codified at Neb. Rev. Stat. §§ 57-1402(2) and 57-1403 (Cum. Supp. 2014)).

[9] See 49 U.S.C. § 60104(c) (2012).

[10] See, 49 U.S.C. § 60104(e); Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. 96-129, § 202(4), 93 Stat. 1003 (1979); *Texas Midstream Gas Serv. v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2013).

[11] See L.B. 1, § 8 (codified at Neb. Rev. Stat. § 57-1407 (Cum. Supp. 2014)).

[12] See *id.*, § 3 (codified at § 57-1402).

[13] See *id.*, § 7 (codified at Neb. Rev. Stat. § 57-1406 (Cum. Supp. 2014)).

[14] See *id.*, § 10 (codified at Neb. Rev. Stat. § 57-1409 (Cum. Supp. 2014)).

[15] See *id.*, § 23.

But MOPSA contained a significant exemption to its requirement that major oil pipeline carriers comply with the PSC procedures: MOPSA did not apply to TransCanada. It excluded any major pipeline carrier that had submitted an application to the U.S. Department of State "pursuant to Executive Order 13337" before MOPSA became effective.[16] The parties stipulated that TransCanada filed its application in 2008. The district court found that when the Legislature enacted MOPSA, TransCanada's Keystone XL pipeline was the only major oil pipeline that satisfied the requirements for MOPSA's exemption.

## 2. Legislature Passes L.B. 4 for TransCanada's Pipeline

In the same special session, the Legislature enacted separate legislation—L.B. 4—for TransCanada's pipeline.[17] L.B. 4 did not specifically refer to TransCanada or its previously submitted application under the exemption from MOPSA (for pending applications). But because L.B. 4 did not contain an exemption, it was the only bill that applied to TransCanada's proposed pipeline by default. And unlike MOPSA, L.B. 4 did not require a pipeline carrier to obtain the PSC's approval before exercising eminent domain power under § 57-1101. Instead, § 3 of L.B. 4 authorized the Department of Environmental Quality (DEQ) to collaborate with any federal agency that was conducting a supplemental environmental impact review for Nebraska under the National Environmental Policy Act of 1969.[18]

The National Environmental Policy Act of 1969 requires federal agencies to determine the environmental impact of significant federal actions. When making this determination, a federal agency must request the comments of appropriate state and local agencies.[19] In collaborating with federal

---

[16] See *id*., § 3(3).

[17] See 2012 Neb. Laws, L.B. 4, 1st Spec. Sess.

[18] See *id*., § 3(1). See, also, Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (codified at 42 U.S.C. §§ 4321 to 4335 and 4341 to 4347 (2012)).

[19] See, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1503.1(a)(2) (2013).

agencies to produce an environmental impact statement for Nebraska, L.B. 4 authorizes the DEQ to hire outside vendors.[20] But § 3(2) stated that to ensure an objective report and avoid the appearance of any conflicts of interest, no costs would be assessed to the applicant.[21] Instead, the Legislature appropriated $2 million from the State's general fund to a DEQ cash fund to carry out the requirements of L.B. 4.[22] After the DEQ prepares the supplemental statement, L.B. 4 requires it to submit its evaluation to the Governor, who then has 30 days to inform the responsible federal agency whether he or she approves the route.[23] Unlike MOPSA, L.B. 4 does not provide an appeal procedure. Like MOPSA, the Legislature provided for an emergency clause for L.B. 4 and it became effective on November 23, 2011, the same date that MOPSA became effective.[24]

On January 18, 2012, the President of the United States denied TransCanada's application. Because TransCanada no longer had an active application pending with the U.S. Department of State, it was subject to the PSC regulatory procedures under MOPSA if it reapplied for a presidential permit or route through Nebraska.

### 3. Legislature Passes L.B. 1161 Giving Major Oil Pipeline Carriers a Procedural Choice

On January 19, 2012, during the regular session, Senator Jim Smith introduced L.B. 1161, which amended the statutory changes to § 57-1101 enacted by MOPSA and § 3 of L.B. 4.[25] As explained, under MOPSA, the Legislature had previously amended § 57-1101 to provide that a pipeline carrier had to

---

[20] See L.B. 4, § 3(2) (codified at Neb. Rev. Stat. § 57-1503(2) (Cum. Supp. 2014)).

[21] See *id*.

[22] See 2012 Neb. Laws, L.B. 4A, 1st Spec. Sess.

[23] See L.B. 4, § 3(4) (codified at § 57-1503(4)).

[24] See *id*., § 8.

[25] See Legislative Journal, 102d Leg., 2d Sess. 292 (2012).

apply for and obtain the PSC's approval before exercising eminent domain power to build a pipeline—unless it had a pending application for a presidential permit. L.B. 1161 eliminated this statutory exemption.[26] But the Legislature also enacted a regulatory choice for major oil pipeline carriers seeking to exercise eminent domain power. Under § 1 of L.B. 1161, a pipeline carrier had two choices: It could comply with § 3 of L.B. 4, as amended by L.B. 1161, "and receive the approval of the Governor for the route," or it could comply with the MOPSA approval process through the PSC.[27]

Originally, § 3 of L.B. 4 did not require a pipeline carrier to apply for approval from the DEQ or the Governor. As noted, it authorized the DEQ to collaborate with federal agencies in producing a supplemental environmental impact statement for Nebraska and authorized the Governor to approve that statement.[28] But L.B. 1161 amended § 3 of L.B. 4 so that the DEQ had two options. It could still collaborate with federal agencies on preparing a supplemental environmental impact statement. But instead of collaborating with federal agencies, the DEQ could now choose to independently evaluate a proposed route submitted by a pipeline carrier for being included in a federal review process to determine the environmental impact of an oil pipeline.[29]

Senator Smith testified at the committee hearing that L.B. 1161 was intended to decouple the DEQ's efforts from those of the U.S. Department of State under federal law and to allow the DEQ to continue with its review of an alternative route for the Keystone XL pipeline.[30] This decoupling was necessary because TransCanada did not have a permit request pending with the U.S. Department of State. And after the President denied TransCanada's application for a permit,

---

[26] See L.B. 1161, § 4.

[27] See *id*., § 1 (codified at § 57-1101 (Cum. Supp. 2014)).

[28] See L.B. 4, § 3.

[29] See L.B. 1161, § 7 (codified at § 57-1503(1)(a)).

[30] See Natural Resources Committee Hearing, L.B. 1161, 102d Leg., 2d Sess. 3 (Feb. 16, 2012).

the DEQ had discontinued its review of a pipeline route in Nebraska. A representative of TransCanada testified in support of L.B. 1161 and stated that the company planned to reapply for a presidential permit.[31] In response to concerns that other pipeline carriers could use L.B. 1161's provisions in the future, TransCanada's representative assured senators that this scenario was unlikely and that no other pipeline carrier was currently seeking to cross Nebraska.[32]

In conducting an independent review of a proposed route, L.B. 1161 requires the DEQ to analyze the "environmental, economic, social, and other impacts associated with the proposed route and route alternatives in Nebraska."[33] Under § 1, after the DEQ evaluates the impact of a pipeline carrier's proposed route and submits its report to the Governor, the carrier can then seek the Governor's approval of the route.

The DEQ's final report on TransCanada's proposed route shows that it makes no recommendations to the Governor whether to approve a proposed route. And L.B. 1161 does not require a carrier to have approval from the DEQ for its proposed route. If the Governor approves a route, § 1 implicitly gives a pipeline carrier the power of eminent domain in Nebraska: "If condemnation procedures have not been commenced within two years after the date the Governor's approval is granted or after the date of receipt of an order approving an application under [MOPSA], the right under this section expires."[34] In sum, when a carrier elects to proceed under the DEQ procedures, the Governor has sole authority to approve the route and thereby bestow upon the carrier the power to exercise eminent domain.

Under L.B. 1161, if a pipeline carrier submits a route for evaluation by the DEQ, the carrier must reimburse the DEQ for the cost of the evaluation.[35] Yet, the Legislature reappropriated

---

[31] *Id.* at 18-19 (testimony of Robert Jones).

[32] *Id.* at 20.

[33] L.B. 1161, § 3.

[34] *Id.*, § 1; § 57-1101.

[35] *Id.*, § 7 (codified at § 57-1503(1)(b)).

$2 million to the DEQ to carry out its duties under L.B. 1161.[36] Finally, if the Governor does not approve the DEQ's reviewed routes, he or she must notify the pipeline carrier that it must obtain route approval from the PSC.[37] The Legislature did not appropriate any funds to the PSC to carry out the MOPSA requirements. L.B. 1161 did not provide for a right of appeal from the DEQ procedures, so the only appeal procedure is limited to final orders issued by the PSC under MOPSA.[38] The Legislature enacted L.B. 1161 with an emergency clause; it became effective on April 18, 2012.[39]

### 4. The State's Actions in Response to TransCanada's Proposed Pipeline Route

On April 18, 2012, TransCanada submitted for the DEQ's review its preferred alternative route, which it revised to avoid the Sandhills. On May 4, TransCanada filed a new application with the U.S. Department of State to construct the Keystone XL pipeline. On May 24, the DEQ entered into a memorandum of understanding with the U.S. Department of State to collaborate on an environmental review of potential pipeline routes in Nebraska. About 8 weeks later, the DEQ issued a "Feedback Report" after holding public meetings along the corridor of TransCanada's proposed new route. This report identified Nebraskans' concerns, summarized the DEQ's review efforts, and disclosed its concerns to TransCanada to give TransCanada an opportunity to address these concerns in its routing decision.

In September 2012, TransCanada submitted a report to the DEQ entitled "Supplemental Environmental Report for the Nebraska Reroute." In this report, TransCanada stated that it had revised its preferred reroute in response to the DEQ's feedback report and comments from landowners that the pipeline

---

[36] *Id.*, § 8.

[37] *Id.*, § 3(4) (codified at § 57-1503(4)).

[38] See § 57-1409.

[39] See L.B. 1161, § 11.

would still cross fragile land areas with high water tables. The extensive report comprised TransCanada's evaluation of the review factors required by L.B. 1161: "The analysis presented in this [Supplemental Environmental Report] supports [the] DEQ's review and approval of a preferred route in Nebraska." The parties stipulated that if built, the proposed pipeline would cross Nebraska's border with South Dakota in Keya Paha County and continue to Nebraska's Kansas border in Jefferson County. In October, the DEQ issued its "Draft Evaluation Report" for public comment.

On January 3, 2013, the DEQ submitted its final evaluation report to the Governor. On January 22, the Governor approved TransCanada's proposed route and asked the President and the U.S. Secretary of State to include Nebraska's evaluation in the U.S. Department of State's supplemental environmental impact statement.

## 5. Procedural History

In March 2013, the landowners filed their operative complaint against the Governor, the DEQ's director, and the State Treasurer. They sought a declaratory judgment that L.B. 1161 is unconstitutional. They alleged that the bill violated the Nebraska Constitution's equal protection, due process, and separation of powers provisions, and its prohibition of special legislation. They alleged that the bill unconstitutionally delegated to the Governor powers over a common carrier that exclusively belong to the PSC and unconstitutionally delegated to the Governor plenary authority over the exercise of eminent domain power that exclusively belongs to the Legislature. Finally, they alleged that the bill unlawfully allocated $2 million to the DEQ to implement unconstitutional laws and unlawfully pledged the State's funds and credit to a pipeline applicant that repays the funds in the future. In support of this claim, they alleged that the DEQ had advanced more than $5 million in public funds to TransCanada under L.B. 1161.

In its answer, the State denied the landowners' allegations that L.B. 1161 was unlawful legislation. It affirmatively

alleged that the landowners lacked standing to bring the action; their claims were not ripe for judicial review; their claims, in part, were moot; they failed to state a claim upon which relief could be granted; and the court lacked subject matter jurisdiction over the action.

The court tried the case on stipulated facts and exhibits. At the hearing, the landowners specifically stated that they were asserting a facial challenge to L.B. 1161. Regarding the landowners' standing, the State contended that they lacked standing because they could not show an injury in fact. Regarding the due process claim, the State argued that if a pipeline carrier initiated a condemnation proceeding, a landowner could thereafter contest the fair market value of the property and whether the taking of his or her private property served a public purpose. The State also disputed the landowners' position that their claim fell into the standing exception for taxpayers to challenge illegal expenditures by governmental bodies and officials. It argued that TransCanada was required to reimburse the State for all the costs incurred by the DEQ and that TransCanada had reimbursed the State for costs that included the DEQ employees' overtime and benefits and the DEQ's consultant fees.

## 6. Court's Order

The court stated that because it could not determine from the landowners' affidavits whether their property was located in the path of the proposed pipeline, they had failed to establish traditional standing. But the court concluded that they had established taxpayer standing to challenge L.B. 1161 and that the legislation was unconstitutional. Regarding standing, the court rejected the State's arguments that our case law required the landowners to show that there was no better suited party to bring the action and that no illegal expenditure existed because TransCanada had reimbursed the State for all of the DEQ's expenditures.

The court concluded that in the case on which the State was relying, this court's holding regarding "better suited" parties was limited to the claims dealing with a governmental body or

official's failure to assess taxes.[40] It determined that the requirement did not apply to illegal expenditure cases and that even if it did, we had also held there that no party is better suited than a taxpayer to challenge a failure to tax if the persons or entities directly and immediately affected by the omission have benefited from the act.[41] The court concluded that under our case law, the landowners had standing because the case raised matters of great public concern and the group directly affected by L.B. 1161—pipeline carriers—had benefited from the act and had no incentive to challenge it. The court noted that the evidence showed a representative of TransCanada, the only pipeline carrier to invoke L.B. 1161's provisions, testified for its passage.

The court rejected the State's argument that the landowners had lost standing to challenge an illegal expenditure after TransCanada reimbursed the State for the DEQ's costs. The court noted that this argument was more properly characterized as a mootness challenge, but concluded that taxpayer standing should not turn on a manipulable factor like the repayment of public funds: "Nor should courts, in analyzing taxpayer standing, be required to resort to forensic accounting methods to determine whether all public expenditures have been reimbursed." The court found that in response to the State's invoices, TransCanada had reimbursed the State for over $5 million in costs. It concluded that our case law conferred standing on taxpayers to challenge illegal appropriations and that reimbursements do not divest them of standing.

Regarding the landowners' constitutional challenges, the court rejected all their arguments except one. It concluded that pipeline carriers are common carriers and that absent specific legislation, the PSC's authority over them is absolute. It

---

[40] See *Project Extra Mile v. Nebraska Liquor Control Comm.*, 283 Neb. 379, 810 N.W.2d 149 (2012).

[41] See *id*.

concluded that the Legislature had unconstitutionally divested the PSC of control over pipeline common carriers and had delegated the routing decisions for them to the DEQ and the Governor. It rejected the State's argument that routing decisions are not within the PSC's constitutionally enumerated powers.

The court also rejected the State's argument that because a pipeline carrier could choose to comply with the PSC's regulatory procedures, L.B. 1161 was not unconstitutional in every circumstance, which would defeat the landowners' facial challenge. The court reasoned that the landowners' challenge was limited to that part of L.B. 1161 that allows pipeline carriers to choose the DEQ's review process and the Governor's approval of a route. It concluded that L.B. 1161 completely divested the PSC of authority over carriers that make this election and thus violated article IV, § 20, of the Nebraska Constitution. It concluded that L.B. 1161 must be declared void, as well as the Governor's approval of TransCanada's route, because it was premised on an unconstitutional statute.

## IV. ASSIGNMENTS OF ERROR

The State assigns that the court erred in (1) determining that the landowners had taxpayer standing, (2) determining that an environmental review by the DEQ and approval by the Governor for proposed oil pipelines that are not intrastate common carriers divests the PSC of its authority, in violation of Neb. Const. art. IV, § 20; and (3) considering an exhibit that was not admitted into evidence.

On cross-appeal, the landowners assign that the court erred in failing to hold that L.B. 1161 is unconstitutional and void because it (1) fails to provide for judicial review and violates due process; (2) confers upon the Governor the authority to grant a private entity the power to exercise eminent domain; (3) lacks a legal standard against which to test applications for authority to act as a common carrier; and (4) involves an unlawful pledge of the State's credit to a private entity.

## V. STANDARD OF REVIEW

[1-3] We independently review questions of law decided by a lower court.[42] A jurisdictional question which does not involve a factual dispute presents a question of law.[43] The constitutionality of a statute also presents a question of law.[44]

## VI. ANALYSIS

### 1. Standing

#### (a) Common-Law Requirements and Relevant Exceptions

[4,5] Standing is a jurisdictional component of a party's case.[45] Only a party that has standing—a legal or equitable right, title, or interest in the subject matter of the controversy—may invoke the jurisdiction of a court or tribunal.[46] Common-law standing usually requires a litigant to demonstrate an injury in fact that is actual or imminent.[47]

[6-8] But taxpayer standing is an exception to the injury-in-fact requirement. Here, the district court determined that the landowners had taxpayer standing for two reasons. First, taxpayers have an equitable interest in public funds, including state public funds.[48] So a resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes.[49] Additionally, a taxpayer's action sometimes raises matters of great public concern that far exceed the type of injury in fact an individual could normally assert in an

---

[42] See *Kelliher v. Soundy*, 288 Neb. 898, 852 N.W.2d 718 (2014).

[43] See *id*.

[44] See *J.M. v. Hobbs*, 288 Neb. 546, 849 N.W.2d 480 (2014).

[45] *Butler Cty. Sch. Dist. v. Freeholder Petitioners*, 283 Neb. 903, 814 N.W.2d 724 (2012).

[46] *Field Club v. Zoning Bd. of Appeals of Omaha*, 283 Neb. 847, 814 N.W.2d 102 (2012).

[47] *Project Extra Mile, supra* note 40.

[48] See *id*.

[49] *Id*.

action against government officials or entities.[50] So we have recognized a limited exception for taxpayer actions that raise such matters.[51] The district court determined that both of these exceptions applied.

### (b) Parties' Contentions

The State argues that the court erred in concluding the landowners had taxpayer standing based solely on a challenged appropriation. It contends that no illegal expenditure occurred because L.B. 1161 requires a pipeline carrier to reimburse the State for the DEQ's regulatory costs in evaluating a proposed route. It also argues that the landowners failed to show there is no better suited plaintiff to bring the action as required by *Project Extra Mile v. Nebraska Liquor Control Comm*.[52]

The landowners argue that this case illustrates why taxpayers have an interest in challenging unlawful appropriations, regardless of whether the legislation requires reimbursement of the expenditures. They point to evidence that TransCanada has reimbursed the State for over $5 million in costs, despite a legislative appropriation to the DEQ of only $2 million.

The landowners contend that they made a prima facie showing there is no better party to bring the challenge and that the State adduced no evidence to refute their position. The landowners also argue that it is irrelevant whether TransCanada reimbursed the State. They argue that they are challenging the facial validity of L.B. 1161, not whether an illegal expenditure occurred in this particular case.

Neither party, however, has addressed the court's determination that this case raises a matter of great public concern. But we agree with that determination.

### (c) Analysis

We adopted the "great public concern" exception in *Cunningham v. Exon*.[53] There, the plaintiff, a citizen taxpayer,

---

[50] See *id*.

[51] See *Cunningham v. Exon*, 202 Neb. 563, 276 N.W.2d 213 (1979).

[52] *Project Extra Mile, supra* note 40.

[53] See *Cunningham, supra* note 51.

brought a declaratory judgment action against the State. The taxpayer challenged the validity of two constitutional amendments to article VII, § 11, which governs public funding of schools. The voters had adopted one of the Legislature's proposed amendments but rejected a second one. Because of the way the proposals were presented, the vote had the effect of omitting language that restricted the State from accepting "money or property to be used for sectarian purposes," unless the sole source of money was a federal grant and it was distributed according to the terms of the grant. The plaintiff challenged the presentation to the voters. He argued that the restriction had been inadvertently omitted because the Legislature had not explained the effect of voting for the first proposal and against the second. The district court dismissed the action, concluding that the plaintiff lacked standing.

We had previously recognized that a taxpayer, without showing an injury peculiar to himself, has standing to challenge an unlawful governmental expenditure or appropriation, or an unlawful increase in the burden of taxation.[54] Yet, the challenged act in *Cunningham* involved neither circumstance. The State argued that the only persons who could have standing to challenge the amendments were the potential recipients of federal funds who were affected by the amendments. We rejected that argument and adopted a standing exception "where matters of great public concern are involved and a legislative enactment may go unchallenged unless plaintiff has the right to bring the action."[55] We quoted the Colorado Supreme Court's holdings regarding a taxpayer's standing to obtain a declaratory judgment even if the taxpayer's interest was no different from that of any other taxpayer:

> "[W]e can conceive of no greater interest a taxpayer can have than his interest in the form of government under which he is required to live, or in any proposed change thereof. In the last analysis, this interest may well exceed any pecuniary interest he may have. The interest and

---

[54] See, e.g., *Niklaus v. Miller*, 159 Neb. 301, 66 N.W.2d 824 (1954); *Martin v. City of Lincoln*, 155 Neb. 845, 53 N.W.2d 923 (1952).

[55] *Cunningham, supra* note 51, 202 Neb. at 567, 276 N.W.2d at 215.

concern of plaintiff as a taxpayer is not primarily con-
fined to himself alone, but is of 'great public concern'. .
. . If a taxpayer and citizen of the community be denied
the right to bring such an action under the circumstances
presented by this record, then the wrong must go unchal-
lenged, and the citizen and taxpayer reduced to mere
spectator without redress."[56] . . . The Colorado Supreme
Court later reaffirmed [this] holding . . . with respect to
statutory provisions involving a reorganization of state
government and said: "The rights involved extend beyond
self-interest of individual litigants and are of 'great pub-
lic concern.'"[57]

In *Cunningham*, we concluded that this exception, which
permitted citizens to challenge unlawful statutes and ordi-
nances, applied even more strongly to an action challenging the
validity of a constitutional amendment:

> There can be no doubt that the amendment . . . raises
> issues of great public interest and concern . . . . It is also
> obvious that if the amendment . . . cannot be challenged
> by a citizen and taxpayer unless and until he has a special
> pecuniary interest or injury different from that of the pub-
> lic generally, it is entirely possible that no one may have
> standing to challenge it. An amendment which changes
> the provisions of a state constitution as to the use of pub-
> lic funds for sectarian and educational purposes is of such
> great public interest and concern that a citizen taxpayer
> should have standing sufficient to maintain an action for
> a declaratory judgment . . . *without the necessity of show-
> ing that he has sustained some special injury peculiar to
> himself and distinct from that of the public generally.*[58]

---

[56] *Id.* (emphasis supplied), quoting *Howard v. Boulder*, 132 Colo. 401, 290
P.2d 237 (1955).

[57] *Id.* at 567-68, 276 N.W.2d at 215, quoting *Civil Serv. Emp. v. Love*,
167 Colo. 436, 448 P.2d 624 (1968), and citing *Portmann v. Board of
Elections*, 60 Ohio App. 54, 19 N.E.2d 531 (1938), and *Abbott v. Iowa
City*, 224 Iowa 698, 277 N.W. 437 (1938).

[58] *Cunningham, supra* note 51, 202 Neb. at 568-69, 276 N.W.2d at 216
(citation omitted) (emphasis supplied).

[9] The "great public concern" exception is another name for the "public interest" exception[59] that we recognized in our early mandamus cases. That is, in our early mandamus cases, we distinguished between private rights and the public's interest and held that a plaintiff has standing to enforce a public right. Our earliest decision regarding standing to raise a public interest was *State, ex rel., Ferguson v. Shropshire*.[60] There, the Legislature had passed a law that a justice of the peace could hold court in any precinct of a city regardless of where he lived, despite a constitutional provision that such officials shall reside in the precinct where they were elected. We held that the statute was unconstitutional. We determined that the plaintiff need not show an interest peculiar to himself to seek a writ of mandamus to compel the defendant to comply with this duty:

> "Where the question is one of public right, and the object of the mandamus is to procure the enforcement of a public *duty*, the people are regarded as the real party, and the relator, at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and as such interested in the execution of the laws."[61]

Contrary to the dissent, we do not conclude that our early mandamus cases are distinguishable because the landowners sought a declaratory judgment here instead of a writ of mandamus. In either case, a plaintiff's standing rests upon a public interest, not a private one. The primary difference between our early mandamus cases and more recent cases lies in our narrowing of the public interest that is sufficient to invoke taxpayer standing, and in *State ex rel. Reed v. State*,[62] we implicitly recognized the commonality in these lines of cases.

In *State ex rel. Reed*, we stated that the exception in our early mandamus cases to permit citizens to enforce a public

---

[59] See 81A C.J.S. *States* § 457 at 679 (2004).

[60] *State, ex rel., Ferguson v. Shropshire*, 4 Neb. 411 (1876).

[61] *Id*. at 413-14. See, also, *Van Horn v. State*, 51 Neb. 232, 70 N.W. 941 (1897).

[62] *State ex rel. Reed v. State*, 278 Neb. 564, 773 N.W.2d 349 (2009).

right had been clarified in *Cunningham*. And we noted that since *Cunningham*, we have declined to find an exception to the requirement that the plaintiff have a personal stake in the outcome of the controversy. Specifically, we declined to extend *Cunningham* when the plaintiff claimed that (1) city officials had unlawfully entered into a cable television contract for the residents[63] and (2) commissioners of the Nebraska State Racing Commission had exceeded their statutory authority in approving license applications for simulcast racing.[64] We distinguished *Cunningham* as involving a constitutional issue.

In another case, *Ritchhart v. Daub*,[65] the plaintiff conceded that she had not alleged a taxpayer's action and she did not raise the exception for a matter of great public concern. We held she lacked standing to seek a declaratory judgment that a mayor's hiring agreements with two city officials violated the city's charter. The officials had agreed that if the mayor discharged them, they would not appeal to the personnel board. We recognized a trend to expand standing requirements, but concluded that the trend rested on concerns that if the plaintiff were denied standing, no party could represent the public's interest: "The threshold question, then, when a party attempts to base standing on an injury common to the general public, has been whether or not there exists another party whose interests are more at issue in the action, and who is thus more appropriately entitled to present the claim."[66] We concluded that the officials who signed the agreements would be the more appropriate plaintiffs to challenge the mayor's authority if he ever attempted to enforce their waivers.

We summarized our public interest case law in *State ex rel. Reed*:

> Exceptions to the rule of standing must be carefully applied in order to prevent the exceptions from

---

[63] *Green v. Cox Cable of Omaha*, 212 Neb. 915, 327 N.W.2d 603 (1982).

[64] *Neb. Against Exp. Gmblg. v. Neb. Horsemen's Assn.*, 258 Neb. 690, 605 N.W.2d 803 (2000).

[65] *Ritchhart v. Daub*, 256 Neb. 801, 594 N.W.2d 288 (1999).

[66] *Id.* at 808, 594 N.W.2d at 293.

swallowing the rule. Other than for challenges to the unauthorized or illegal expenditure of public funds, our more recent cases have narrowed such exceptions to situations where matters of great public concern are involved and a legislative enactment may go unchallenged unless the plaintiff has the right to bring the action.[67]

In *State ex rel. Reed*, we concluded the plaintiff's claim that state officials had violated their duties was really his attempt to impose his opinions on *how* they should exercise their duties. He lacked standing to try to influence state officials' discretionary duties through a legal action. But we clearly recognized that taxpayers could have standing to challenge unlawful governmental acts involving a matter of great public concern. And we have more recently suggested that one of our illegal expenditure cases should be treated as raising a matter of great public concern.

In *Chambers v. Lautenbaugh*,[68] the illegal expenditure case, the plaintiff alleged that the Douglas County election commissioner had illegally redrawn the district boundary lines for the election of city council members. We concluded that the plaintiff had standing because he had alleged an illegal expenditure of public funds. Our conclusion rested on the plaintiff's allegations that the commissioner's office had spent and would continue to spend public money and public employees' time to implement the allegedly illegal boundary lines.

Under *Chambers*, preventing the use of public time and money to implement and enforce allegedly invalid rules is a sufficient interest to confer taxpayer standing to challenge the rules.[69] That holding would have obvious application here. But in *Project Extra Mile*,[70] we recognized a tension between *Chambers* and other cases in which we had held that a claim of unauthorized government action was insufficient to confer

---

[67] *State ex rel. Reed, supra* note 62, 278 Neb. at 571, 773 N.W.2d at 355.

[68] *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002).

[69] See *Project Extra Mile, supra* note 40.

[70] *Id.*

standing absent an individualized injury in fact. We suggested that *Chambers* should be treated as a case raising a matter of great public concern:

> This conflict [in our case law] occurs because of the competing considerations frequently presented by taxpayer actions. Primarily, government officials must perform their duties without fear of being sued whenever a taxpayer disagrees with their exercise of authority. But courts also recognize that a taxpayer may be the only party who would challenge an unlawful government action because the persons or organizations directly affected by the government action have benefited from it. Additionally, a taxpayer's action sometimes raises matters of great public concern that far exceed the type of injury in fact that an individual could normally assert in an action against government officials or entities.
>
> These competing concerns explain the tension between *Chambers* and our cases holding that an allegation of unlawful government action is insufficient to show an illegal expenditure of public funds. *Arguably,* Chambers *would have been more correctly presented as raising a matter of great public concern: If true, the county election commissioner's alleged statutory violation would have unlawfully altered the way that the city's residents elected their city council representatives.*[71]

Our suggestion in *Project Extra Mile* that *Chambers* should be treated as raising a matter of great public concern is consistent with our reasoning in *Cunningham*. That is, a citizen taxpayer's interest in his or her form of government exceeds any pecuniary interests he or she may have in other types of government action. In both *Chambers* and *Cunningham*, because all citizens had an interest in their representatives' obeying the law, no resident taxpayer could have claimed a greater interest than any other to challenge the alleged violations. Of course, that was also true in cases decided after *Cunningham*. But *Cunningham* involved a claim that the Legislature had unlawfully changed the constitution,

---

[71] *Id*. at 389-90, 810 N.W.2d at 159-60 (emphasis supplied).

and *Chambers* involved a claim that an election commissioner had unlawfully changed the way citizens elected their local representatives.

Like claims involving the election of representatives and the way the constitution can be changed, the claims here also involve the citizens' interest in their form of government. Specifically, the landowners alleged violations of the constitutionally required distribution of political powers in this state. The substantive issues are whether the Legislature (1) unlawfully delegated a duty constitutionally conferred on the PSC to the Governor and (2) unlawfully delegated to the Governor the Legislature's power to bestow the State's right of eminent domain on private organizations. These issues necessarily involve the delegation of powers under the Nebraska Constitution, which are fundamental matters of great public concern to all resident taxpayers.

In deciding this appeal, we are cognizant that our standing rules are circumscribed by case law. Unlike federal courts, we are not bound by the strictures of constitutional standing requirements.[72] Nebraska, like most state courts, has no constitutional "case" or "controversy" requirement that has resulted in the federal courts' strict application of standing rules. For example, unlike taxpayer standing in state courts, this concept is almost nonexistent in federal courts.[73] Our common-law standing rules, like all doctrines of justiciability, arise out of prudential considerations of the proper role of the judiciary in a democratic government with coequal branches of government.[74] Thus, in the vast majority of cases, we will not determine whether the Legislature has exceeded its powers unless the issue is raised by a party who is entitled to judicial resolution of a dispute involving his or her interests.

---

[72] See, e.g., *Susan B. Anthony List v. Driehaus*, ___ U.S. ___, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014); *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989).

[73] 13B Charles Alan Wright et al., Federal Practice and Procedure § 3531.10.1 (2008 & Supp. 2014).

[74] See *Nebraska Coalition for Ed. Equity v. Heineman*, 273 Neb. 531, 731 N.W.2d 164 (2007).

But without an exception for matters of great public concern, elected representatives could flout constitutional violations with impunity. As we explained in *Project Extra Mile*, we have recognized taxpayer standing because "[a] good deal of unlawful government action would otherwise go unchallenged"[75] and "following the law would be 'irrelevant to those entrusted to uphold it.'"[76] The same reasoning applies here. The exception for matters of great public concern ensures that no law or public official is placed above our constitution.

So when a taxpayer claims that the Legislature enacted a law that undermines the fundamental limitations on government powers under the Nebraska Constitution, this court has full power and the responsibility to address the public rights raised by a challenge to that act. Without the prudent exercise of such judicial responsibility, the Legislature might successfully define the role of all government bodies. Where, as here, the Governor and the current members of the PSC have acquiesced in the Legislature's disregard of the Nebraska Constitution's distribution of powers,[77] the need for citizens to have standing to raise a matter of great public concern is apparent. How could a taxpayer show a direct injury if the Legislature statutorily abolished the PSC? Which taxpayer does not have a right to the PSC's continued existence under the Nebraska Constitution? Additionally, the landowners have alleged that the Legislature has unconstitutionally authorized the Governor to decide who can exercise the power of eminent domain in Nebraska. These claimed violations of constitutional law, if true, undermine the structure of state government. Thus, the issues raised here "far exceed the type of injury in fact that an

---

[75] *Project Extra Mile*, *supra* note 40, 283 Neb. at 390, 810 N.W.2d at 160.

[76] *Id*. at 388, 810 N.W.2d at 158.

[77] See, Nebraska Public Service Commission, No. 183, Order Releasing Third Set of Proposed Rules and Seeking Comment (Aug. 21, 2012) (proposing rules to define "pipeline," "pipeline carrier," and "major oil pipeline" in title 291, ch. 9; promulgating § 023 to govern routing of "major oil pipelines" *if* Governor has not approved route under L.B. 4); 291 Neb. Admin. Code, ch. 9, §§ 001 and 023 (2013).

individual could normally assert in an action against govern-ment officials or entities."[78]

So we reject the State's argument that recognizing taxpayer standing in this case would essentially eliminate any standing requirements for taxpayers. As we stated in *Project Extra Mile*, public officials must be free to perform their duties without fear of being sued whenever a citizen disagrees with their exercise of authority. But there is a critical distinction between exercising legitimate authority and a claim that public officials ignored constitutional constraints on that authority.

This does not mean that taxpayers may challenge any leg-islation that allegedly violates a constitutional provision with-out the need to show an injury in fact. Legislative missteps often will not raise a matter of great public concern. But when a taxpayer's action raises every citizen's interest in the Legislature's obedience to the fundamental distribution of power in this state, the public interest necessarily rises to the level of a "great public concern." If the exercise of eminent domain over private property and the constitutional require-ments for the organization of state government do not raise matters of great public concern, then no issue could be suffi-ciently potent to give citizens the right to challenge an unlaw-ful government action. So to deny standing here would likely slam the courthouse doors on future taxpayer actions raising a public interest.

The inscription above the main entrance to this Capitol pro-claims that the "Salvation of the State is Watchfulness in the Citizen." For that inscription to have meaning, someone must have standing to defend the Nebraska Constitution, regardless of whether a direct injury can be shown.

Finally, the State argues that under *Project Extra Mile*, any taxpayer who cannot show a direct injury should be required to show that there is no better suited party to bring the action. We disagree. As noted, in *Cunningham*, the State specifically

---

[78] See *Project Extra Mile, supra* note 40, 283 Neb. at 390, 810 N.W.2d at 159-60.

argued that the only persons who had standing to challenge the constitutional amendments were those persons who could lose federal funding because of the change. And we rejected that argument.

[10] The State misconstrues *Project Extra Mile* by omitting a crucial limitation on the holding that a taxpayer must show there is no better suited party to bring the action:

> We hold that a taxpayer has standing to challenge a state official's failure to comply with a clear statutory duty to assess or collect taxes—as distinguished from legitimate discretion to decide whether to tax. But the taxpayer must show that the official's unlawful failure to comply with a duty to tax would otherwise go unchallenged because no other potential party is better suited to bring the action. . . . *We further hold that no other potential parties are better suited than a taxpayer to claim that a state agency or official has violated a statutory duty to assess taxes when the persons or entities directly and immediately affected by the alleged violation are beneficially, instead of adversely, affected.*[79]

This discussion was obviously directed at cases involving an unlawful failure to assess or collect taxes. And the italicized holding was clearly intended to preclude the argument that a plaintiff must rule out every other possible plaintiff. Instead, under *Project Extra Mile*, a plaintiff satisfies the burden to show that there is no better party to bring the action if the plaintiff shows that persons or entities directly and immediately affected by the unlawful act are beneficially affected by it.

So even if we extended *Project Extra Mile* to other types of taxpayer actions, the burden would be met here. TransCanada, in particular, and all major pipeline carriers, benefited from having a procedural choice. First, the Governor's approval of a route under the DEQ procedures was not subject to judicial review. Second, even if the Governor denied approval of a

---

[79] *Id.* at 391, 810 N.W.2d at 160-61 (emphasis supplied).

route, a major oil pipeline carrier could seek PSC approval. These two advantages alone are sufficient to show that major oil pipeline carriers benefited from the passage of L.B. 1161.

More important, the exception for matters of great public concern, by definition, must involve an issue that affects many citizens. Obviously, the plaintiff in *Cunningham* could not have satisfied a burden to show there was no better suited party if that phrase is interpreted to mean that a taxpayer has the burden to demonstrate and rule out all those persons who might sustain a more direct injury. So *Cunningham* clearly shows that either there is no such requirement for this exception or there is no better suited party to challenge an allegedly unconstitutional legislative act when every citizen has an equal interest in the Legislature's compliance with the constitution.

Similarly, the State argued to the district court that the only persons who should have standing to challenge L.B. 1161 are those facing a condemnation proceeding when TransCanada exercises the power of eminent domain. But the challenge here is that the Governor has no constitutional authority to decide whether TransCanada can exercise that power. A challenge in which every citizen has an interest should not hinge upon whether any particular landowner in an approved pipeline route has the resources and ability to resist a condemnation proceeding on constitutional grounds. Equally important, any landowner resisting condemnation would be required to challenge the legislation as unconstitutional for the same issues that are presented here. Given the widespread significance of these constitutional issues, we will not deny standing on the chance that a different citizen could raise the issue. We conclude that the holding in *Project Extra Mile*—that a taxpayer must show an alleged unlawful act would otherwise go unchallenged because no other potential party is better suited to bring the action—has no application to taxpayer actions raising a matter of great public concern.

Before concluding our standing analysis, we address some of the dissent's comments. The dissent erroneously asserts

that the division of opinion regarding standing creates an "impasse" that prevents its consideration of the constitutional claims. There is no impasse. The four judges of this court who have concluded that the landowners have standing are not a "plurality," as the dissent asserts. We are the majority on the issue of standing, and our decision controls. That is, our decision is the court's decision on standing and the law governing this case.

The dissent correctly notes that "[j]urisdictional requirements apply equally to all cases." In this seven-member court, it takes only four judges to determine if the case meets the jurisdictional requirements for this court to consider the merits. We apply this rule of majority "equally to all cases," including the one before us.

The dissent incorrectly claims that five votes are required to determine standing and hence jurisdiction. The dissent cites no constitutional provision and no authority to support this imaginative assertion. Neb. Const. art. V, § 2, in relevant part, provides the following:

> A majority of the judges shall be necessary to constitute a quorum. A majority of the members sitting shall have authority to pronounce a decision except in cases involving the constitutionality of an act of the Legislature. No legislative act shall be held unconstitutional except by the concurrence of five judges.

While the supermajority provision in this passage clearly requires five judges to concur on the conclusion that a legislative act is unconstitutional, the dissent reads into this provision the additional requirement that five judges concur on the conclusion that this court has jurisdiction to decide the question. The dissent, however, does not have four votes for its constitutional interpretation, and we, the majority, conclude that the dissent's interpretation is not warranted and, in any event, not controlling.

The quorum provision in article V, § 2, sets the minimum number of judges who must sit before this court can decide a case. Quorum provisions ensure that a case is not decided by

one or two judges on a court.[80] In contrast, minimum concurrence and supermajority requirements are intended to ensure deference to legislative enactments.[81] And unlike the quorum provision in article V, § 2, the supermajority provision is a voting requirement on the resolution of the case—as distinguished from a preliminary requirement that merely determines whether the court can take action.[82] The supermajority requirement comes into play only after this court determines that quorum requirements and jurisdictional requirements are satisfied.

The plain language of the supermajority requirement in article V, § 2, applies only to our voting on the merits of the constitutional challenge. That is, it is limited by its terms to requiring five votes to hold that an enactment is unconstitutional. We have never held that this provision requires five votes to decide any procedural or jurisdictional issue in a case presenting a constitutional challenge to a statute.

So we reject the dissent's interpretation of the supermajority requirement and the dissent's assertion that our approach would yield "absurd" results. It is true that this provision can lead to unusual results. But the dissent's hypothetical voting outcomes are not absurd results. They simply flow from the Nebraska Constitution's unusual supermajority requirement.[83] The only "absurd" result would be for a minority of judges, who disagree with the court's decision on standing, to control whether the court can consider the constitutionality of a legislative enactment.

---

[80] See Jonathan Remy Nash, *The Majority That Wasn't: Stare Decisis, Majority Rule, and the Mischief of Quorum Requirements*, 58 Emory L.J. 831, 839-50 (2009).

[81] See Jonathan L. Entin, *Judicial Supermajorities and the Validity of Statutes: How* Mapp *Became a Fourth Amendment Landmark Instead of a First Amendment Footnote*, 52 Case W. Res. L. Rev. 441, 450, 473 (2001).

[82] See Nash, *supra* note 80.

[83] See *id*. at 851 n.75 (stating that "[c]urrently two states—Nebraska and North Dakota—have constitutional requirements for the invalidation of statutes on state constitutional grounds by the state supreme court").

We note that there are numerous examples of judges who dissented on a jurisdictional matter *and* reached the merits of the appeal, if only to express his or her disagreement.[84] It is true that other appellate judges who dissented on a jurisdictional issue limited their opinion to that issue.[85] These cases may reflect a tension between a judge's desire to be consistent with his or her opinion that jurisdiction is lacking and a court's duty to decide cases. But they also illustrate that whether a judge reaches the merits of an appeal when he or she is outvoted on a jurisdictional issue is a matter of discretion with each judge. Moreover, in those cases, whether the dissenting judges reached the merits of the appeal or not, their opinion on those issues was not dispositive. That is not true here. By declining to participate in deciding the merits of this appeal, the three justices dissenting on standing have effectively prevailed without providing a rationale which is due the parties and citizens of Nebraska.

In sum, although the dissent disagrees with the court's decision on standing, there is no constitutional or jurisprudential barrier that precludes the dissenting judges from proceeding to decide the landowners' constitutional challenge to L.B. 1161. And because the case presents a matter of great public concern, the citizens of this state deserve a decision on the merits.

Clearly, the dissent would narrow *Cunningham*'s standing exception for matters of great public concern to the point that the exception is nonexistent. But *Cunningham* is not an outlier case; it is consistent with our early mandamus cases.

---

[84] See, e.g., *Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) (Scalia, J., dissenting); *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003) (Souter, J., dissenting); *Hammer v. Sam's East, Inc.*, 754 F.3d 492 (8th Cir. 2014) (Riley, Chief Judge, dissenting); *Patel v. U.S. Citizenship and Immigration Services*, 732 F.3d 633 (6th Cir. 2013) (Daughtrey, Circuit Judge, dissenting); *Harris v. City of Zion, Lake County, Ill.*, 927 F.2d 1401 (7th Cir. 1991) (Easterbrook, Circuit Judge, dissenting).

[85] See, e.g., *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008) (Roberts, C.J., dissenting); *EPA, supra* note 84 (Roberts, C.J., dissenting).

More important, *Cunningham* is the law of this jurisdiction. Obviously, *Cunningham* did not require the plaintiff to show an injury in fact or to rule out potential parties who would have a more direct interest in the controversy to establish standing. And that conclusion was correct.

*Cunningham*'s great public concern exception to traditional standing exists for a reason. The primary hurdle for application of the great public concern exception, as we have narrowed it, is the existence of a great public concern—not the availability of a perfect plaintiff with injury-in-fact standing. The dissent's reasoning on standing would so limit the pool of effective plaintiffs as to render taxpayers mere spectators without a forum to challenge a perceived manipulation by the Legislature of the fundamental limits on political power in Nebraska. This we will not do.

### 2. L.B. 1161 UNCONSTITUTIONALLY DELEGATES THE PSC'S REGULATORY AUTHORITY TO THE GOVERNOR

The landowners contend that the court correctly ruled that L.B. 1161 violates article IV, § 20, because it divests the PSC of its control over a class of common carriers and transfers its powers to the Governor.

The State counters that because the landowners presented a facial challenge to L.B. 1161, they must show that the legislation is invalid in every circumstance. They conclude that the court erred in determining that L.B. 1161 is facially unconstitutional for three reasons. First, the State contends that under Nebraska's statutes, only intrastate pipeline carriers—and not interstate pipeline carriers—transporting oil products are common carriers subject to the PSC's regulatory control. It argues that the court should have interpreted L.B. 1161 as applying only to interstate carriers, which would be constitutional. Second, the State contends that because private pipeline carriers could validly seek the Governor's approval of their routes, L.B. 1161 is not invalid in every circumstance. Finally, the State contends that even if the PSC has exclusive control over pipeline carriers, routing decisions are not within its enumerated powers.

[11] The landowners have the burden of establishing that L.B. 1161 is unconstitutional.[86] We presume that statutes are constitutional and will not strike down a statute unless its unconstitutionality is clearly established.[87] But the State devotes much of its brief to arguing that L.B. 1161 is distinguishable from other legislation that we have previously struck down as unconstitutional. So before discussing the parties' arguments, we set out the relevant laws underlying their arguments.

(a) The PSC's Powers and the Legislature's
Power to Restrict Them

[12] The PSC is not a statutorily created state agency. Until 1972, it was called the State Railway Commission (Commission).[88] It is an independent regulatory body for common carriers[89] created by the Nebraska Constitution in article IV, § 20:

> There shall be a Public Service Commission . . . . The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision.

We have previously explained the historical facts leading up to the voters' adoption in 1906 of article IV, § 20.[90] In short, state voters rejected three legislative proposals to create a regulatory body over common carriers that was part of the executive branch of government. It was not until the Legislature proposed a permanent and independent commission—limited only as the Legislature may provide by specific legislation—that the voters approved an amendment to the constitution.

---

[86] See *Big John's Billiards v. State*, 288 Neb. 938, 852 N.W.2d 727 (2014).

[87] *Hobbs, supra* note 44.

[88] See 1972 Neb. Laws, L.B. 347.

[89] See, e.g., *Swanson v. Sorenson*, 181 Neb. 312, 148 N.W.2d 197 (1967).

[90] See *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949).

[13] Consistent with this constitutional history, we have held that the PSC has "independent legislative, judicial, and executive or administrative powers" over common carriers,[91] which powers are plenary and self-executing.[92] Absent specific legislation, the PSC's enumerated powers over common carriers are absolute and unqualified.[93]

[14-18] Later, in *State ex rel. Spire v. Northwestern Bell Tel. Co.*,[94] we summarized our case law in five rules that govern the PSC's regulatory authority and the Legislature's power to restrict it:

• First, in any field where the Legislature has not acted, the constitution authorizes the PSC to exercise its plenary powers over common carriers.[95]

• Second, under article IV, § 20, the Legislature can restrict the PSC's plenary powers only through specific legislation.[96]

• Third, the term "specific legislation" means specific restrictions. It does not include general legislation to divest the PSC of its jurisdiction and transfer its powers to another governmental entity or official besides the Legislature: "The Legislature cannot constitutionally divest the PSC of jurisdiction over a class of common carriers by vesting a governmental agency, body of government, or branch of government, *except the Legislature*, with control over the class of common carriers."[97]

• Fourth, the Legislature can divest the PSC of jurisdiction over a class of common carriers by passing specific legislation

---

[91] *Swanson, supra* note 89, 181 Neb. at 316, 148 N.W.2d at 200.

[92] See, e.g., *Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975).

[93] *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999).

[94] *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989).

[95] *Id.*

[96] *Id.*, citing *Chicago & N. W. Ry. Co. v. County Board of Dodge County*, 148 Neb. 648, 28 N.W.2d 396 (1947).

[97] *Id.* at 276, 445 N.W.2d at 294 (emphasis supplied).

that occupies a regulatory field, thereby preempting the PSC's control.[98]
• Fifth, if the Legislature passes specific legislation to divest the PSC of jurisdiction in a regulatory field, the Legislature cannot abandon control over the common carriers in that field. Under article IV, § 20, regulatory control over common carriers must reside either in the PSC or in the Legislature.[99]

[19] Specifically, because of the Commission's constitutional jurisdiction over common carriers, we have held that a party cannot initiate an action in district court to enforce a statute requiring a common carrier to provide reasonable accommodations.[100] And in *State ex rel. State Railway Commission v. Ramsey*,[101] we held that the Legislature has no power to divest the Commission of its constitutional jurisdiction to regulate and control common carriers by transferring its power to a statutorily created agency. Although statutes are presumed to be constitutional, we concluded that the controlling principles were the Constitution's supremacy and this court's duty to "trace the line which marks the limit of power, and to cause compliance with it."[102] So unless the Legislature enacts legislation to specifically restrict the PSC's authority and retains control over that class of common carriers, it cannot constitutionally deprive the PSC of its regulatory powers.

(b) The Meaning of a "Common Carrier"
in Nebraska

[20,21] The PSC's constitutional authority to regulate "common carriers" is limited to the common-law meaning of that term unless the Legislature has authorized the PSC to exercise

---

[98] See *State ex rel. Spire, supra* note 94, citing *Rodgers v. Nebraska State Railway Commission*, 134 Neb. 832, 279 N.W. 800 (1938), and *State v. Chicago & N. W. Ry. Co.*, 147 Neb. 970, 25 N.W.2d 824 (1947).

[99] See *id.*

[100] *Rivett Lumber & Coal Co. v. Chicago & N. W. R. Co.*, 102 Neb. 492, 167 N.W. 570 (1918).

[101] *Ramsey, supra* note 90.

[102] *Id.* at 347, 37 N.W.2d at 510.

control over carriers that are outside of that meaning.[103] A carrier refers to an "individual or organization . . . that contracts to transport passengers or goods for a fee."[104] The common law recognizes only two types of carriers: common carriers and private carriers,[105] although the terms "private carrier" and "contract carrier" are used interchangeably.[106]

[22,23] In *City of Bayard v. North Central Gas Co.*,[107] we set out definitions for both private carriers and common carriers. We defined a private carrier as one that, without being in the business of transporting for others or holding itself out to the public as willing to do so, undertakes only by special agreement to transport property, either gratuitously or for a consideration.[108] In contrast, under our case law,

> any person, corporation, or association holding itself out to the public as offering its services to *all persons similarly situated* and performing as its public vocation the services of transporting passengers, freight, messages, or commodities for a consideration or hire, is a common carrier in the particular spheres of such employment.[109]

In *City of Bayard*, the evidence showed that the defendant gas company was using its own pipelines and distribution systems to transport gas it purchased to consumers in cities that had granted it a franchise by contract. No evidence showed that it transported gas for others, gratuitously or for a consideration. We held that the company was not a common carrier and could not be subjected to the Commission's control.[110]

---

[103] *Nebraska Pub. Serv. Comm., supra* note 93.

[104] Black's Law Dictionary 256 (10th ed. 2014).

[105] *State v. Union Stock Yards Co.*, 81 Neb. 67, 115 N.W. 627 (1908).

[106] See Black's Law Dictionary, *supra* note 104 at 256-57.

[107] *City of Bayard v. North Central Gas Co.*, 164 Neb. 819, 83 N.W.2d 861 (1957).

[108] See *id.*

[109] *Id.* at 830, 83 N.W.2d at 867.

[110] See *City of Bayard, supra* note 107. See, also, *The Pipe Line Cases*, 234 U.S. 548, 34 S. Ct. 956, 58 L. Ed. 1459 (1914).

[24] As the above definition of common carrier implies, under Nebraska's common law, whether a carrier offers its services to the general public—like a passenger carrier, for example—is not always relevant to determining whether it is a common carrier. Instead, a carrier is a common carrier if its "vocation is of a public nature, although limited to the transportation of certain classes or kinds of freight, and it may be of service to a limited few who by their peculiar situation or business may have occasion to employ it."[111] Under the *City of Bayard* definition, transporting commodities for others is a vocation of a public nature even if the service is not available to the public at large. We have specifically held that a railyard switching company, which served a limited number of railroads, was a common carrier because it held itself out as willing to transport goods for all railroads entering the railyard.[112]

[25] Under our definition of a common carrier, an oil pipeline carrier is a common carrier if it holds itself out as willing to transport oil products for a consideration to all oil producers in the area where it offers its transportation services. The State does not dispute the landowners' contention that TransCanada is a common carrier, and a Texas case supports that conclusion.[113] For this appeal, we assume that this is true.

As stated, the landowners contend that the court correctly ruled that L.B. 1161 violates article IV, § 20, because it divests the PSC of its control over a class of common carriers and transfers its powers to the Governor. The rules that we have set out above clearly support that contention. We therefore turn to the State's arguments that L.B. 1161 is not facially unconstitutional in every circumstance.

First, the State argues that the court erred in concluding that all oil pipeline carriers are common carriers. It claims that interstate pipeline carriers are not common carriers under

---

[111] *Union Stock Yards Co., supra* note 105, 81 Neb. at 75, 115 N.W. at 631 (citations omitted).

[112] See *Union Stock Yards Co., supra* note 105.

[113] See *Crawford Family v. TransCanada Keystone*, 409 S.W.3d 908 (Tex. App. 2013).

Nebraska's statutes and that the court erred in failing to interpret L.B. 1161 as applying to only interstate pipeline carriers.

### (c) Analysis

[26] The State correctly contends that a plaintiff can succeed in a facial challenge only by establishing that no set of circumstances exists under which the act would be valid, i.e., that the law is unconstitutional in all of its applications.[114] But it incorrectly argues that because some Nebraska statutes distinguish between interstate and intrastate oil pipelines, the court should have relied on these statutes to conclude that L.B. 1161 applies only to interstate pipeline carriers. The State argues that interstate carriers are not common carriers subject to the PSC's control. The State points to no statute that explicitly restricts the PSC's powers, but it argues that courts must try to interpret statutes to be constitutional.

### (i) Nebraska's Statutes Are Not Specific Legislation to Restrict the PSC's Regulatory Powers

As stated, unless the Legislature enacts legislation to specifically restrict the PSC's authority and retains control over that class of common carriers, it cannot constitutionally deprive the PSC of its regulatory powers. The State points to Neb. Rev. Stat. § 75-501 (Reissue 2009), which provides that pipeline carriers transporting oil for hire in Nebraska intrastate commerce "shall be a common carrier subject to commission [the PSC] regulation." It contends that this statute defines a pipeline common carrier as one that transports oil for hire only in intrastate commerce (i.e., only within Nebraska's borders). The State also relies on Neb. Rev. Stat. § 75-502 (Cum. Supp. 2014), which was amended by L.B. 1[115] to provide the following underlined text: "Pipeline carriers which are declared common carriers under section 75-501, pipeline carriers approved under [MOPSA], and pipeline carriers for which the Governor approves a route under section 57-1503 may store, transport,

---

[114] See *Lindner v. Kindig*, 285 Neb. 386, 826 N.W.2d 868 (2013).

[115] See L.B. 1, § 20.

or convey any liquid or gas [and] may lay down, construct, maintain, and operate pipelines . . . ." The State contends that the delineation of different types of carriers in § 75-502 shows that the Legislature did not intend for all pipeline carriers to be considered common carriers.

The State's reliance on these statutes is misplaced. Although it argues that interstate carriers are not common carriers under Nebraska law, it does not argue that they are private carriers. It appears to argue that interstate pipeline carriers of oil are a class by themselves—neither common nor private carriers. But under Nebraska common law, there are only two classes of carriers: private and common. "Interstate" is not a class by itself. Interstate pipeline carriers under federal law are also classified as private or common, and pipeline carriers transporting oil in interstate commerce are subject to federal regulation as common carriers.[116] So we will not interpret § 75-502's mere description by statute of the carriers that can lay pipelines in this state as a legislative declaration—contrary to federal law—that interstate carriers are not common carriers when they cross Nebraska.

We also reject the State's argument that § 75-501 defines the term "common carrier" for persons transporting oil products. Section 75-501 provides:

> Any person who transports, transmits, conveys, or stores liquid or gas by pipeline for hire in Nebraska intrastate commerce shall be a common carrier subject to commission regulation. The commission [PSC] shall adopt, promulgate, and enforce reasonable rules and regulations establishing minimum state safety standards for the design, construction, maintenance, and operation of pipelines which transport liquefied petroleum gas or anhydrous ammonia in intrastate commerce by common carriers. *Such rules and regulations, and the interpretations thereof, shall conform with the rules, regulations, and interpretations of the appropriate federal agencies with authority to regulate pipeline common carriers in interstate commerce*. Any person may determine the

---

[116] See *The Pipe Line Cases, supra* note 110.

>    validity of any such rule or regulation in such manner as
>    provided by law.

(Emphasis supplied.)

[27] Section 75-501 does not explicitly state that it is defining a term or limiting the PSC's authority to intrastate carriers. Interpreting § 75-501 to define the whole field of pipeline common carriers would be an expansive reading and contrary to the statute's historical context. The statute explicitly acknowledges that federal agencies regulate interstate pipeline carriers, and it is this tension that explains why the statute's reach is limited to intrastate pipeline carriers. Section 75-501's historical context shows that the Legislature intended only to ensure that intrastate carriers are regulated.

In 1906, Congress amended the federal Interstate Commerce Act (ICA) to make interstate oil transporters common carriers subject to federal regulation.[117] In 1914, the U.S. Supreme Court held that Congress could require federal regulation of interstate pipeline carriers that were operating as common carriers.[118] But the ICA, both before and after the 1906 amendment, included an exception for common carriers engaged in the transportation of passengers or property "wholly within one State."[119]

In 1903, the Nebraska Legislature passed the first law giving pipeline carriers an unconditional right to exercise the power of eminent domain in Nebraska to construct a pipeline.[120] The law did not distinguish between interstate and intrastate carriers and imposed no regulatory control over carriers. In 1903, the Commission did not exist.

In 1917, the Legislature repealed the 1903 law and replaced it with a statute declaring that pipelines transporting oil products or gases from one point in Nebraska to another point for a consideration are common carriers. These carriers could

---

[117] See *id.*

[118] See *id.*

[119] See Interstate Commerce Act, 24 Stat. 379 (1887) and 34 Stat. 584 (1906).

[120] See 1903 Neb. Laws, ch. 67, § 1, p. 364.

exercise the power of eminent domain but were subject to the Commission's control and regulation.[121] Because the Legislature repealed the 1903 law, no statute authorized interstate carriers to exercise eminent domain. But that omission is not surprising. In 1917, Nebraska's lawmakers would have understood that they had authority to regulate intrastate common carriers and that the Commerce Clause prohibited them from burdening interstate commerce.[122]

It is true that absent preemptive federal laws, the Legislature probably could have enacted siting laws to protect the health of its citizens if those laws did not unnecessarily impede interstate commerce.[123] But in 1917, the law defining the limits of a state's power over interstate carriers was not clear. So viewed through the prism of federal law, Nebraska's 1917 enactment was not a *limitation* of the Commission's power to regulate only intrastate carriers. It was an *assertion* of the Commission's power to regulate such carriers.

In 1923, the Legislature passed a bill giving *interstate* pipeline carriers an unconditional right to exercise eminent domain.[124] The statute did not declare interstate carriers to be common carriers or subject them to the Commission's control.

In 1963, the Legislature enacted comprehensive legislation to reorganize statutes related to the Commission's powers.[125] The reorganization resulted in a separation of the eminent domain statute for pipelines from the statutes dealing with the Commission's powers over pipelines. One bill authorized both interstate and intrastate pipeline carriers to exercise eminent domain under the same procedures.[126] Another bill,

---

[121] See 1917 Neb. Laws, ch. 112, § 1, p. 284.

[122] See, e.g., *The Pipe Line Cases, supra* note 110.

[123] See, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915 (1945).

[124] See 1923 Neb. Laws, ch. 173, § 1, p. 409; Neb. Rev. Stat. § 75-609 (Reissue 1958).

[125] See 1963 Neb. Laws, L.B. 82, ch. 425, p. 1354.

[126] See 1963 Neb. Laws, L.B. 789, ch. 323, p. 979 (codified at Neb. Rev. Stat. §§ 57-1101 to 57-1106 (Reissue 2009 & Cum. Supp. 2014)).

governing the Commission's regulatory powers, reasserted its powers over intrastate carriers, but did not make any substantive changes to the 1917 statute.[127] Again, the Legislature did not assert any regulatory power over interstate pipeline carriers. But states' power to regulate the siting of interstate pipelines was unclear before 1979.

Current federal law expressly preempts state regulation of safety issues related to interstate oil pipelines.[128] But since Congress enacted the Hazardous Pipeline Safety Act of 1979, federal law does not preempt a state's right to determine the siting of an interstate pipeline if the state laws are unrelated to safety.[129] Before 1979, however, there was no federal statute expressly stating that states had this right. So in 1963, the Legislature could have justifiably concluded that the Commerce Clause precluded state laws governing the location or siting of interstate pipelines that were inconsistent with the laws of other states or that imposed unnecessary costs on interstate carriers.[130]

Given this history, we do not interpret the Legislature's silence on the State's regulation of interstate carriers as its determination that the Commission could have no regulatory powers over interstate carriers to the extent state regulation is permitted by federal law. Notably, when the Legislature restricted the PSC's authority to regulate some natural gas utilities, the restriction was explicit.[131]

[28,29] It is true that we will interpret a statute to be constitutional if we can do so reasonably.[132] But we liberally

---

[127] See 1963 Neb. Laws, L.B. 82, ch. 425, art. V, p. 1416-17.

[128] See 49 U.S.C. § 60104(c).

[129] See sources cited *supra* note 10.

[130] See, e.g., *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052 (9th Cir. 1987); *Chicago, B. & Q. R. Co. v. Illinois Commerce Commission*, 82 F. Supp. 368 (N.D. Ill. 1949).

[131] See Neb. Rev. Stat. § 66-1803(1) (Reissue 2009).

[132] *Traveler's Indem. Co. v. Gridiron Mgmt. Group*, 281 Neb. 113, 794 N.W.2d 143 (2011).

construe the constitutional provision creating the PSC and delineating its powers.[133] And a canon of statutory construction must yield to constitutional requirements governing the same subject matter. We conclude that none of the statutes cited by the State constitute a "definite restriction" on the PSC's powers.[134] That is, they are not specific legislation to restrict the PSC's regulatory powers over interstate carriers. But the State makes another argument that L.B. 1161 does not apply to all pipeline carriers.

### (ii) Only Common Carriers Can Constitutionally Exercise the State's Power of Eminent Domain

The State argues that the court erred in implicitly assuming that all pipeline carriers operate on a "for hire" basis. It contends that L.B. 1161 could be facially unconstitutional only if every pipeline carrier satisfied the "for hire" requirement for common carriers. In that same vein, it argues that the court erred in determining that a state's authority for a carrier to exercise the power of eminent domain is the essential characteristic of common carrier status. In effect, the State argues that L.B. 1161 is not facially invalid because some of the carriers seeking the Governor's authorization to exercise eminent domain could be private carriers. We disagree that a private carrier serving no public purpose could exercise the power of eminent domain.

The State relies on *City of Bayard*[135] to support its argument that a private carrier could exercise the right of eminent domain. As explained, we held there that a natural gas company was not a common carrier. The Wyoming company had built two pipelines to deliver gas to consumers in Nebraska

---

[133] *Myers, supra* note 92; *In re Yellow Cab & Baggage Co.*, 126 Neb. 138, 253 N.W. 80 (1934).

[134] *State ex. rel. Spire, supra* note 94, 233 Neb. at 276, 445 N.W.2d at 294, quoting *Ramsey, supra* note 90.

[135] *City of Bayard, supra* note 107.

cities that had granted it a franchise by contract. An interstate pipeline was connected to a gas field in Wyoming where it purchased natural gas, and an intrastate pipeline was connected to a gas field in Nebraska where it purchased natural gas. In reaching our conclusion that the company was not a common carrier, we rejected the city's contention that the gas company was a common carrier because it had exercised the right of eminent domain:

> First, [the company] does not render the service of transporting gas for a consideration. Second, [the company] exercised the right of eminent domain as an interstate pipe line, as distinguished from an intrastate pipe line, under the provisions of section 75-609, . . . which it concededly had a right to do.[136]

It is true that § 75-609 granted interstate pipeline carriers the right to exercise eminent domain without declaring them common carriers or imposing any regulatory control. But as explained above, in 1957, when *City of Bayard* was decided, Congress had not passed any law clarifying that states could regulate interstate pipeline carriers. More important, our holding in *City of Bayard* rested on the lack of evidence that the company transported gas for others. We assumed for the analysis that the company could be a common carrier if it had held itself out as transporting gas for hire, but concluded there was no evidence that it had done so.[137] So our reliance there on the absence of any regulation of interstate carriers exercising eminent domain was dicta, because it was unnecessary to the holding.

[30] Equally important, the company was transporting natural gas for a public purpose. We specifically noted that the city had statutory authority[138] to renew the gas company's franchise *and* to regulate the company's rates. It is the public nature of a corporate utility's operations and the public franchise that authorizes its operations which justify government

---

[136] *Id*. at 829, 83 N.W.2d at 867.

[137] See *City of Bayard, supra* note 107.

[138] See Neb. Rev. Stat. § 17-528.02 (Reissue 2012).

regulation of its rates.[139] So the statement the State relies on is not persuasive authority for the State's implicit argument that a private carrier could exercise the right of eminent domain in this state for a nonpublic purpose. That argument is simply wrong.

[31-33] As our definition of common carriers suggests, the reason common carriers can exercise the right of eminent domain lies in their quasi-public vocation of transporting passengers or commodities for others. A citizen's property may not be taken against his or her will, except through the sovereign powers of taxation and eminent domain, both of which must be for a public purpose.[140] Eminent domain is the State's inherent power to take private property *for a public use*.[141]

[34-36] The State's eminent domain power resides in the Legislature and exists independently of the Nebraska Constitution.[142] But the constitution has limited the power of eminent domain, and the Legislature can limit its use further through statutory enactments.[143] Under Neb. Const. art. I, § 21, the State can take private property only for a public use and only if it pays just compensation.[144] Only the Legislature can authorize a private or public entity to exercise the State's power of eminent domain.[145] But it obviously

---

[139] See, *City of University Place v. Lincoln Gas & Electric Light Co.*, 109 Neb. 370, 191 N.W. 432 (1922) (cited in *City of Bayard, supra* note 107); 12 Eugene McQuillin, The Law of Municipal Corporations §§ 34:2, 34:107 (3d ed. 2006).

[140] See, *Burlington Northern Santa Fe Ry. Co. v. Chaulk*, 262 Neb. 235, 631 N.W.2d 131 (2001); *Burger v. City of Beatrice*, 181 Neb. 213, 147 N.W.2d 784 (1967).

[141] See *Fulmer v. State*, 178 Neb. 20, 131 N.W.2d 657 (1964).

[142] See, *Burger, supra note* 140; *Burnett v. Central Nebraska Public Power and Irrigation District*, 147 Neb. 458, 23 N.W.2d 661 (1946); *Consumers Public Power District v. Eldred*, 146 Neb. 926, 22 N.W.2d 188 (1946).

[143] See *id*.

[144] See *Burlington Northern Santa Fe Ry. Co.*, *supra* note 140.

[145] See *Burlington Northern Santa Fe Ry. Co.*, *supra* note 140, *citing SID No. 1 v. Nebraska Pub. Power Dist.*, 253 Neb. 917, 573 N.W.2d 460 (1998).

cannot confer a power that it does not possess under the constitution.[146]

[37] In short, because a common carrier performs a public transportation service, the Legislature can grant it the sovereign power to take private property for a public use and the State can control its operations, to the extent that the regulation is not precluded by federal law.[147] As early as 1908, this court stated that the State's power to regulate common carriers, especially those that were authorized to exercise the power of eminent domain, was firmly established.[148]

[38] But the Nebraska Constitution prohibits the taking of private land for a private purpose.[149] The Texas Supreme Court has addressed this issue in the context of pipeline carriers.[150] It reversed a court of appeals' decision that a property owner could not challenge a common carrier certification by a public service commission. Like the Nebraska Constitution, the Texas Constitution restricts the exercise of eminent domain to a public use. And like this court, Texas courts strictly construe statutes delegating the power of eminent domain. The court held that the commission's certification did not conclusively establish the applicant's common carrier status because the commission undertook no inquiry to confirm that the applicant's pipeline would be for a public purpose. And it held that Texas statutes authorizing eminent domain power for common carriers do not include the owner of a pipeline built for the owner's exclusive use.

---

[146] See, *Burger, supra* note 140; *Fulmer, supra* note 141.

[147] See *Edholm v. Missouri P. R. Corporation*, 114 Neb. 845, 211 N.W. 206 (1926). See, also, *Krauter v. Lower Big Blue Nat. Resources Dist.*, 199 Neb. 431, 259 N.W.2d 472 (1977); *Van Patten v. City of Omaha*, 167 Neb. 741, 94 N.W.2d 664 (1959).

[148] *State v. Pacific Express Co.*, 80 Neb. 823, 115 N.W. 619 (1908).

[149] See, e.g., *Chimney Rock Irr. Dist. v. Fawcus Springs Irr. Dist.*, 218 Neb. 777, 359 N.W.2d 100 (1984); *Burger, supra* note 140; *Vetter v. Broadhurst*, 100 Neb. 356, 160 N.W. 109 (1916).

[150] See *Texas Rice Land v. Denbury Green Pipeline*, 363 S.W.3d 192 (Tex. 2012).

[39] We agree with this reasoning, which is consistent with our holding in other cases prohibiting the use of eminent domain for a private purpose.[151] Under the Nebraska Constitution's limitation on the power of eminent domain, pipeline carriers can take private property only for a public use. That minimally means that a pipeline carrier must be providing a public service by offering to transport the commodities of others who could use its service, even if they are limited in number. So we reject the State's argument that L.B. 1161 is not facially invalid in every circumstance because a private carrier could possibly seek the Governor's approval to exercise the right of eminent domain. The Legislature's authorization of that act would also be unconstitutional.

### (iii) Routing Decisions Are Within the PSC's Enumerated Powers

The State argues that even if the PSC has exclusive regulatory control over pipeline carriers, an environmental review of a pipeline route is not one of its enumerated powers over common carriers: i.e., the PSC's regulation of their rates and service, or exercise of "general control."[152] But the State's argument ignores the Governor's designation under L.B. 1161 as the final arbitrator who approves a pipeline route and our case law that supports the PSC's authority to make this regulatory decision. "[U]nlike some public service commissions, the [PSC], in the different aspects of its constitutional functions, exercises legislat[ive], administrative, and judicial powers."[153] As relevant here, in *In re Application of Chicago, Burlington & Quincy Railroad Co.*,[154] we held that the commission had jurisdiction to decide a dispute over the location of a railway

---

[151] See cases cited *supra* note 149.

[152] See Neb. Const. art. IV, § 20.

[153] *Myers*, *supra* note 92, 194 Neb. at 62, 230 N.W.2d at 196. Accord *Ramsey*, *supra* note 90.

[154] *In re Application of Chicago, Burlington & Quincy Railroad Co.*, 152 Neb. 352, 41 N.W.2d 157 (1950).

service, an issue that requires weighing the carrier's profitability against public necessity. Similarly, we have held that only the Commission could decide a request to compel a railroad company to build a branch to service the petitioners.[155] And we have stated that the Commission, "under the Constitution, has original jurisdiction and sole power to grant, deny, amend, revoke, or transfer common carrier certificates of convenience and necessity."[156]

[40] These decisions refute the State's arguments that routing decisions are not part of the PSC's constitutional powers. Furthermore, the Legislature's requirement that the PSC approve the routes for some pipelines confirms that the PSC has such powers. So, although the Legislature could validly authorize the DEQ to assist the PSC in determining whether to approve the siting of a pipeline carrier's proposed route, L.B. 1161 unconstitutionally allows the Governor to approve the route. This is a regulatory decision that the constitution reserves to the PSC.

## VII. CONCLUSION

This appeal is not about the wisdom or necessity of constructing an oil pipeline but instead is limited to the issues of great public concern raised here: which entity has constitutional authority to determine a pipeline carrier's route and whether L.B. 1161 comports with the Nebraska Constitution's provisions controlling this issue.

Four members of this court, a majority of its seven members, conclude that the district court correctly ruled the landowners have standing to challenge the constitutionality of L.B. 1161. Because their complaint alleged that the act violated limits on political power under the Nebraska Constitution, it raised matters of great public concern. Under our established case law, such matters are an exception to the injury-in-fact requirement for standing. Thus, contrary to the dissent, we hold that the landowners had standing before the district court and this court.

---

[155] See *Rivett Lumber & Coal Co., supra* note 100.

[156] *Ramsey, supra* note 90, 151 Neb. at 340, 37 N.W.2d at 507.

The same four members of this court conclude that the court correctly determined that L.B. 1161 is unconstitutional. L.B. 1161 unconstitutionally transfers to the Governor the PSC's enumerated constitutional powers over common carriers. When a common carrier seeks the Governor's approval of a pipeline route under the DEQ procedures, L.B. 1161 unconstitutionally gives the Governor the authority to approve the route and bestow the power of eminent domain on the carrier. The Nebraska Constitution prohibits this transfer of power. Because we conclude that L.B. 1161 is facially unconstitutional for this reason, we do not address the landowners' other claims.

No member of this court opines that the law is constitutional. But the four judges who have determined that L.B. 1161 is unconstitutional, while a majority, are not a supermajority as required under the Nebraska Constitution. Neb. Const. art. V, § 2, in relevant part, provides that "[n]o legislative act shall be held unconstitutional except by the concurrence of five judges." We reject the dissent's interpretation of this provision as requiring five of the seven members of this court to concur on jurisdictional requirements to hear a case, *in addition to* requiring five judges to concur that a legislative enactment is unconstitutional.

As explained, the supermajority requirement is a voting requirement on the disposition of a constitutional challenge to a statute. It is not a requirement that must be satisfied in order for a court to determine if it may proceed to take action in a case and has no application to jurisdictional decisions. Having been outvoted on the issue of standing, the dissent compounds its error by declining to exercise its option to decide the substantive issues.

Under these circumstances, the constitutional supermajority provision controls the outcome. Although four members of the court conclude that L.B. 1161 violates fundamental constitutional limits on government power in Nebraska, our power is also limited by article V, § 2. We believe that Nebraska citizens deserve a decision on the merits. But the supermajority requirement of article V, § 2, coupled with the dissent's refusal to reach the merits, means that the citizens

cannot get a binding decision from this court. Although we have four judges who conclude that L.B. 1161 is unconstitutional, we do not have five judges voting on the constitutionality of this enactment. Accordingly, we vacate the district court's judgment.

JUDGMENT VACATED.

WRIGHT, J., not participating.

HEAVICAN, C.J., and STEPHAN and CASSEL, JJ., dissenting in part, and in part concurring in the result.

According to the plurality, all that is now required for standing to challenge the constitutionality of a statute is a tax receipt and a cause. To reach the merits of this case, the plurality expands an exception to the general rule of common law standing that has been employed only once before in the history of this court. Although this exception was not briefed by the parties and was mentioned only in passing by the district court, the plurality concludes that the appellees, solely in their capacities as citizen taxpayers, have standing to challenge the constitutionality of L.B. 1161 because it presents "a matter of great public concern." But the plurality ignores the requirement that in order for this exception to apply, it must be shown that the legislative enactment at issue may go unchallenged unless the taxpayer has the right to bring the action. That requirement has not been and cannot be met in this case.

And the plurality is in fact a plurality. While it represents the larger numerical block of votes, that number is insufficient under our constitution to declare a statute unconstitutional.

## STANDING

Courts are obligated to decide the merits of cases which are properly before them, but they have an equally important obligation to refrain from deciding matters over which they lack jurisdiction. A ruling made in the absence of subject matter jurisdiction is a nullity.[1] It is not the office of this court to

---

[1] *Spady v. Spady*, 284 Neb. 885, 824 N.W.2d 366 (2012); *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001); *In re Estate of Andersen*, 253 Neb. 748, 572 N.W.2d 93 (1998).

render advisory opinions.[2] Our responsibility to avoid such rulings is the reason for the oft-cited proposition that before reaching the legal issues presented for review, it is the power and *duty* of an appellate court to determine whether it has jurisdiction over the matter before it.[3] When a lower court lacks the authority to exercise its subject matter jurisdiction to adjudicate the merits of the claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.[4] Jurisdictional requirements apply equally to all cases, large or small, high profile or obscure. We have properly declined to reach even constitutional issues where all jurisdictional prerequisites are not met.[5] Strict adherence to jurisdictional requirements is not a device by which judges avoid making difficult decisions; rather, it is a recognition that judicial authority, like any other form of governmental authority, is subject to certain limitations.

One long-honored limitation on judicial power is the principle of standing. Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's or tribunal's exercising its jurisdiction and remedial powers on the party's behalf.[6] Standing is a component of jurisdiction; only a party that has standing—a legal or equitable right, title, or interest in the subject matter of the controversy— may invoke the jurisdiction of a court or tribunal.[7] Generally, a litigant must assert the litigant's own rights and interests, and cannot rest a claim on the legal rights or interests of

---

[2] *Kramer v. Miskell*, 249 Neb. 662, 544 N.W.2d 863 (1996).

[3] *In re Estate of Potthoff*, 273 Neb. 828, 733 N.W.2d 860 (2007); *In re Estate of Rose*, 273 Neb. 490, 730 N.W.2d 391 (2007); *In re Interest of Sean H.*, 271 Neb. 395, 711 N.W.2d 879 (2006); *Malolepszy v. State*, 270 Neb. 100, 699 N.W.2d 387 (2005).

[4] *Engler v. State*, 283 Neb. 985, 814 N.W.2d 387 (2012).

[5] See, e.g., *Nichols v. Nichols*, 288 Neb. 339, 847 N.W.2d 307 (2014).

[6] *Field Club v. Zoning Bd. of Appeals of Omaha*, 283 Neb. 847, 814 N.W.2d 102 (2012).

[7] *Id.*

third parties.[8] We have often referred to this as common-law standing.[9] And we have explained that under traditional, common-law standing, the persons seeking court action must show some special injury peculiar to themselves aside from a general injury to the public, and it is not sufficient that they have merely a general interest common to all members of the public.[10]

A party invoking a court's or a tribunal's jurisdiction bears the burden of establishing the elements of standing.[11] At one point in these proceedings, the appellees claimed that their interests in the siting of the proposed pipeline were distinct from the interests of the general public, because they owned lands which "'w[ere], or still [are], in the path of one or more proposed pipeline routes suggested by a pipeline carrier applicant who has invoked [L.B.] 1161.'"

But there was a failure of proof. The district court concluded that it was "unable to determine, from the evidence presented, whether the [appellees'] property sits on the current pipeline route . . . or instead sits on a route previously proposed." As such, the district court was "unable to determine whether [the appellees'] alleged injury—as it regards land in the path of the pipeline—is actual and imminent, or merely conjectural and hypothetical." Accordingly, the district court found that the appellees had failed to establish "traditional standing."

The appellees did not cross-appeal from this determination, and as all members of this court agree, they have not established traditional common-law standing to challenge the constitutionality of the legislation at issue here. Thus, their ability to invoke the jurisdiction of a court to adjudicate the constitutionality of L.B. 1161 depends upon whether they fall within one of the exceptions to the common-law standing requirement.

---

[8] *Id.*

[9] See, e.g., *Project Extra Mile v. Nebraska Liquor Control Comm.*, 283 Neb. 379, 810 N.W.2d 149 (2012).

[10] See *State ex rel. Reed v. State*, 278 Neb. 564, 773 N.W.2d 349 (2009).

[11] *Field Club v. Zoning Bd. of Appeals of Omaha, supra* note 6.

This court has recognized very limited exceptions to the standing requirement that a litigant have a personal stake in the outcome of a controversy. Our approach in this regard has been careful and conservative. We have specifically rejected invitations to liberalize our standing requirements.[12] And we have noted that exceptions to the general rule of standing should be "carefully applied"[13] in order to "prevent the exceptions from swallowing the rule."[14] We have recognized three exceptions to traditional standing, stated in the chronological order of their development in our case law:

• Enforcement of a public duty by a mandamus action of a citizen interested in the execution of the laws.[15]
• Action by a resident taxpayer to prevent or recover an illegal expenditure of public funds or to prevent an increase in the burden of taxation.[16]
• Matters of "great public concern" that otherwise would likely go unchallenged.[17]

There is one characteristic shared by all of the exceptions—scarcity of application. The traditional, common-law rule dominates our jurisprudence. The exceptions are few, and resort to them is rare.

## Mandamus to Enforce Public Duty

The first exception to develop has nearly been lost in antiquity. As this court recently summarized,

> In the 19th and early 20th centuries, this court discussed an exception to the requirement that a litigant have a personal stake in the outcome of the controversy. We stated that if the question was one of a public right and the object of mandamus was to procure the enforcement of a public duty, the people were regarded as the

---

[12] See, e.g., *Ritchhart v. Daub*, 256 Neb. 801, 594 N.W.2d 288 (1999).

[13] *State ex rel. Reed v. State, supra* note 10, 278 Neb. at 571, 773 N.W.2d at 355.

[14] *Id.*

[15] See, e.g., *The State v. Stearns*, 11 Neb. 104, 7 N.W. 743 (1881).

[16] See, e.g., *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004).

[17] See *State ex rel. Reed v. State, supra* note 10.

real party in interest. In that situation, the individual bringing the action, the relator, did not need to show that he [or she] had any legal or special interest in the result.[18]

We need not consider this exception further, because the appellees sought a declaratory judgment rather than proceeding for a writ of mandamus. We focus instead on the remaining two exceptions, both of which involve actions brought by persons who have no interest in the subject matter of the suit distinct from that of the general public.

## Resident Taxpayer Exception

The resident taxpayer exception, though rare in comparison to traditional, common-law standing, is much more common than either of the other exceptions.[19] The district court relied on this exception in concluding that the appellees had standing to challenge the constitutionality of L.B. 1161.

Under this exception, a resident taxpayer, without showing any interest or injury peculiar to himself or herself, may bring an action to (1) enjoin the illegal expenditure of public funds raised for governmental purposes[20] or (2) restrain the act of a public board or officer which would increase the burden of taxation without an actual illegal expenditure of public

---

[18] *Id*. at 568, 773 N.W.2d at 354, citing *City of Crawford v. Darrow*, 87 Neb. 494, 127 N.W. 891 (1910); *Van Horn v. State*, 51 Neb. 232, 70 N.W. 941 (1897); *State, ex rel., Ferguson v. Shropshire*, 4 Neb. 411 (1876).

[19] See, *Rath v. City of Sutton, supra* note 16; *Wasikowski v. Nebraska Quality Jobs Bd*., 264 Neb. 403, 648 N.W.2d 756 (2002); *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002); *State ex rel. Steinke v. Lautenbaugh*, 263 Neb. 652, 642 N.W.2d 132 (2002); *Hagan v. Upper Republican NRD*, 261 Neb. 312, 622 N.W.2d 627 (2001); *Ritchhart v. Daub, supra* note 12; *Fitzke v. City of Hastings*, 255 Neb. 46, 582 N.W.2d 301 (1998); *Professional Firefighters of Omaha v. City of Omaha*, 243 Neb. 166, 498 N.W.2d 325 (1993); *Rexroad, Inc. v. S.I.D. No. 66*, 222 Neb. 618, 386 N.W.2d 433 (1986); *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth*., 220 Neb. 504, 371 N.W.2d 258 (1985); *Haschke v. School Dist. of Humphrey*, 184 Neb. 298, 167 N.W.2d 79 (1969); *Martin v. City of Lincoln*, 155 Neb. 845, 53 N.W.2d 923 (1952).

[20] *Martin v. City of Lincoln, supra* note 19.

funds.[21] To plead a resident taxpayer's action, the plaintiff must allege a demand made upon the municipal or public corporation and a refusal by the corporation to bring the action itself, or facts which show that such a demand would be useless.[22]

In *Project Extra Mile v. Nebraska Liquor Control Comm.*,[23] standing was based on a challenger's status as a taxpayer. This court held the taxpayer was also required to show the unlawful action would otherwise go unchallenged:

We hold that a taxpayer has standing to challenge a state official's failure to comply with a clear statutory duty to assess or collect taxes—as distinguished from legitimate discretion to decide whether to tax. *But the taxpayer must show that the official's unlawful failure to comply with a duty to tax would otherwise go unchallenged because no other potential party is better suited to bring the action.* In an action brought under [Neb. Rev. Stat.] § 84-911 [(Reissue 2008)], this rule means a taxpayer has standing to challenge an agency's unlawful regulation that negates the agency's statutory duty to assess taxes. We further hold that no other potential parties are better suited than a taxpayer to claim that a state agency or official has violated a statutory duty to assess taxes when the persons or entities directly and immediately affected by the alleged violation are beneficially, instead of adversely, affected.[24]

In its analysis of taxpayer standing in this case, the district court erroneously concluded that *Project Extra Mile* "does not require [the appellees] to show [L.B.] 1161 would otherwise go unchallenged unless taxpayers have the right to bring the action." In *Project Extra Mile*, we concluded that the taxpayer had met her "burden" of establishing standing to challenge the Nebraska Liquor Control Commission's classification of

---

[21] See *Rath v. City of Sutton*, *supra* note 16.

[22] *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth.*, *supra* note 19.

[23] *Project Extra Mile v. Nebraska Liquor Control Comm.*, *supra* note 9.

[24] *Id.* at 391, 810 N.W.2d at 160-61 (emphasis supplied).

malt beverages as beer for purposes of taxation by showing that the only parties directly affected by the classification were sellers of malt liquor who were beneficially affected by the classification and thus had no incentive to challenge it. If it had been unnecessary for the taxpayer to show that there was no one better suited to maintain the action challenging the classification, we would not have characterized such a showing as a component of the taxpayer's burden to establish standing.

## EXCEPTION FOR MATTERS OF
## GREAT PUBLIC CONCERN

The exception for matters of "great public concern" appears to have entered our jurisprudential lexicon in 1979 via this court's opinion in *Cunningham v. Exon*.[25] Drawing on cases from other jurisdictions, this court recognized an exception "where matters of great public concern are involved and a legislative enactment may go unchallenged unless [the] plaintiff has the right to bring the action."[26] In that case, a constitutional amendment changed the provisions regarding the use of public funds for sectarian and educational purposes. The question was whether a portion of the Nebraska Constitution had been omitted inadvertently when the Secretary of State printed the constitution following an election of the people to amend the constitution. The *Cunningham* court recognized that without an exception to the general rule, no person was likely to have a special injury peculiar to himself and distinct from that of the public generally.

*Cunningham* is the only case in which we have applied this exception to the general rule of common-law standing before today. Perhaps that is because *Cunningham* provides no objective basis for determining whether a particular issue is one of "great public concern." Moreover, the issue in *Cunningham* involved the structural integrity of the state Constitution itself, not whether one of hundreds of laws enacted by the Legislature violated a constitutional provision, as is the claim here. As the

---

[25] *Cunningham v. Exon*, 202 Neb. 563, 276 N.W.2d 213 (1979).

[26] *Id*. at 567, 276 N.W.2d at 215.

plurality correctly notes, we have specifically declined to apply the exception in similar contexts.[27]

At this point, it is worth noting that the appellees have never claimed standing based upon this exception. Instead, they alleged that they had standing as "taxpayers with interests in unlawful expenditure of state funds as required by [L.B.] 1161." Not surprisingly, the only exception to the traditional standing requirement analyzed by the district court was "taxpayer standing." At one point in that analysis, the district court noted that "[t]he issues involved in this case are of great public concern . . . ." But it did not cite *Cunningham* or specifically analyze the exception which that case recognized. And there is no reference to *Cunningham* or its holding in any of the appellate briefs.

Nevertheless, the plurality invokes the holding of *Cunningham*, which until now has been limited to the specific facts of that case. First, it observes that the "great public concern" exception recognized in *Cunningham* is "another name for the 'public interest' exception that we recognized in our early mandamus cases." But our opinion in *Cunningham* makes no reference to any mandamus cases decided by this court. It adopts the "great public concern" exception from the law of other jurisdictions, primarily Colorado. In an attempt to make the connection between the early mandamus cases and *Cunningham*, the plurality reads too much into our recent case law, which simply does not link the two lines of authority.

Next, the plurality attempts to identify the issue of "great public concern" presented in this case. As the district court correctly and properly observed in the first paragraph of its order, the issue in this case is not whether the proposed pipeline approved by the Governor should be built, but only whether L.B. 1161, which authorized such approval, is constitutional. The plurality elevates this rather narrow and straightforward separation of powers issue into an issue of "great public

---

[27] See *Green v. Cox Cable of Omaha, Inc.*, 212 Neb. 915, 327 N.W.2d 603 (1982). See, also, *Neb. Against Exp. Gmblg. v. Neb. Horsemen's Assn.*, 258 Neb. 690, 605 N.W.2d 803 (2000).

concern" by characterizing the challenge to L.B. 1161 as one involving "the citizens' interest in their form of government" and "fundamental limitations on government powers under the Nebraska Constitution."

Any challenge to the constitutionality of a statute can be characterized as involving the "fundamental limitations on government," because by enacting an unconstitutional statute, the Legislature necessarily exceeds its lawful authority. For the same reason, it could always be said that an allegedly unconstitutional statute would fall within "the citizens' interest in their form of government." But we have never held that any citizen has standing to challenge the constitutionality of any statute. The plurality attempts to limit the scope of its reasoning but provides no objective basis for doing so. It observes that "the exception for matters of great public concern, by definition, must involve an issue that affects many citizens," but does not explain how approval of a pipeline route by the Governor instead of the Public Service Commission would affect anyone other than the pipeline company and the owners of property in the path of the approved pipeline route.

Even if we could accept this reasoning and agree an issue of "great public concern" is presented, the plurality's analysis would still fail. *Cunningham* requires not only that the issue presented be of "great public concern," but also that the "legislative enactment may go unchallenged unless [the] plaintiff has the right to bring the action."[28] This second requirement was not simply a throwaway line in the opinion. Rather, it is an important and necessary counterbalance to the exception to the general rule that a party must have a personal stake in a controversy in order to have standing. As we stated in *Ritchhart v. Daub*,[29] "[t]he threshold question, . . . when a party attempts to base standing on an injury common to the general public, has been whether or not there exists another party whose interests are more at issue in the action, and who is thus more appropriately entitled to present the claim." It is not a question of whether this principle should be imported from *Project Extra*

---

[28] *Cunningham v. Exon, supra* note 25, 202 Neb. at 567, 276 N.W.2d at 215.

[29] *Ritchhart v. Daub*, *supra* note 12, 256 Neb. at 808, 594 N.W.2d at 293.

*Mile*, as the plurality suggests, because it has always been an integral part of the holding in *Cunningham*.

In *Cunningham*, we rejected an argument that the only persons who would have standing to challenge the constitutional amendment were "potential" recipients of federal funds who "may have been" affected by the amendment.[30] We reasoned that if the amendment could not be challenged by a citizen and taxpayer "unless and until he [or she] has a special pecuniary interest or injury different from that of the public generally, it is entirely possible that no one may have standing to challenge it."[31]

But that cannot be said here. When the Governor signed the pipeline siting authorization pursuant to the authority conferred by L.B. 1161, every owner of real property which became subject to condemnation for the pipeline acquired a special pecuniary interest or injury different from that of the public generally, and thus had traditional standing to challenge L.B. 1161. Anyone mildly familiar with Nebraska geography would understand that the route approved by the Governor measures in the hundreds of miles. There must be dozens, if not hundreds, of potential plaintiffs who own property along the proposed pipeline route who would have traditional, common-law standing to bring a declaratory judgment action to challenge the constitutionality of L.B. 1161, or to assert the constitutional issue in condemnation proceedings. Indeed, one or more of the appellees may have a direct interest sufficient to establish traditional standing but simply failed to prove it.

The plurality states that "the landowners have alleged that the Legislature has unconstitutionally authorized the Governor to decide who can exercise the power of eminent domain in Nebraska." Certainly a "landowner" whose property was subject to condemnation for a pipeline route approved by the Governor would have standing to assert this claim. But the appellees did not establish that *their* property was subject to condemnation for the pipeline. For purposes of standing, they

---

[30] *Cunningham v. Exon, supra* note 25, 202 Neb. at 567, 276 N.W.2d at 215.

[31] *Id.* at 568, 276 N.W.2d at 216.

are no different than the owner of an office building in down-town Omaha.

It is true, as the plurality states, that a pipeline company whose proposed route was approved by the Governor would have no incentive to challenge L.B. 1161. But it cannot be seriously contended that property owners facing condemna-tion of large swaths of their farmland to make way for the pipeline were "beneficially affected" by L.B. 1161 so as to have no incentive to challenge it. Also, if the Public Service Commission believed that its constitutional jurisdiction were threatened by L.B. 1161, it would have traditional standing to challenge it.[32] This is simply not a case where a legisla-tive enactment is likely to go unchallenged unless a taxpayer or other citizen who lacks traditional standing is permitted to mount the challenge. And because of that, the very nar-row exception to the general rule of standing recognized in *Cunningham* is not applicable.

In support of its reasoning, the plurality asks, "How could a taxpayer show a direct injury if the Legislature statutorily abolished the [Public Service Commission]?" If those were the facts before us, we might agree that the *Cunningham* exception applied. Legislative abolition of a constitutional agency would be a structural alteration of the state Constitution which would not produce an immediate adverse impact on any specific citi-zen, as was the case in *Cunningham*. But here, the Legislature did not abolish the Public Service Commission or take away any of its powers. Instead, it conferred alternative jurisdiction on the executive to approve the site of a proposed pipeline. The Governor's actions based on that authority had a direct impact on owners of property in the path of the pipeline and, argu-ably, the Public Service Commission itself. Those parties have traditional standing, and are thus better suited than a citizen or taxpayer who is not directly affected by L.B. 1161 to challenge its constitutionality.

---

[32] See, e.g., *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989); *Ritums v. Howell*, 190 Neb. 503, 209 N.W.2d 160 (1973); *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949).

This court has in the past carefully applied exceptions to the traditional, common-law rule of standing in order to "prevent the exceptions from swallowing the rule."[33] The plurality's new and expansive interpretation of the exception for matters of great public concern consumes the time-honored common-law rule in a single gulp. Under its reasoning, *any* resident taxpayer or citizen has standing to challenge *any* public act which can be subjectively characterized as a matter of "great public concern," despite the fact that the would-be plaintiff can demonstrate no personal stake in the matter, and regardless of the existence of other persons who can.

Whether or not it constitutes a matter of "great public concern," the constitutional challenge to L.B. 1161 is a legitimate issue which should be decided by a court as expeditiously as possible. But it must be decided by a court with jurisdiction to do so, or the entire judicial process is for naught. Courts cannot choose to overlook jurisdictional defects; we are obligated to resolve cases on the basis of how they are actually brought to us, not on the basis of how they should have been brought to us. With due respect to our colleagues, we are unwilling to rewrite the law of standing in order to reach the merits of this case. Because these appellees did not meet their burden of establishing that they had standing when the suit was commenced, the district court did not have jurisdiction to decide the constitutional issue, and neither does this court.

## JUDICIAL RESTRAINT

Because we believe that we lack jurisdiction to do so, we express no opinion as to the constitutionality of L.B. 1161, and we see no purpose to be served by the plurality's willingness to do so. Given this court's division on the issue of standing in this case, there is neither a five-member supermajority to hold that L.B. 1161 is unconstitutional nor a three-member minority which could uphold its constitutionality. Due to this impasse, the constitutional challenge to L.B. 1161 cannot be resolved one way or the other in this case.

---

[33] *State ex rel. Reed v. State, supra* note 10, 278 Neb. at 571, 773 N.W.2d at 355.

Contrary to the view of the plurality, we do not have an "option" to opine on the merits after concluding that we lack jurisdiction to do so. The plurality cites to case law from other jurisdictions, including the U.S. Supreme Court, for the proposition that a judge may dissent on a jurisdictional issue and simultaneously reach the merits of the appeal. But as the plurality itself acknowledges, none of the cited law involves the dissenting judge's issuing an opinion on the merits having precedential value. In other words, while the judges opined on the merits even after finding the court lacked jurisdiction, their opinions did not affect the ultimate resolution of the case by the court.

But as the plurality acknowledges, that is not the situation here. Instead, it invites us to reach the merits in order to resolve the constitutional issue. Apparently, the plurality believes that the constitutional supermajority requirement could be achieved in this fashion. We do not share that view.

Our constitution provides: "A majority of the members [of the Supreme Court] sitting shall have authority to pronounce a decision *except in cases involving the constitutionality of an act of the Legislature*. No legislative act shall be held unconstitutional except by the concurrence of five judges."[34] Where four members of the court conclude that a statute is unconstitutional, a contrary conclusion by the remaining three members is sufficient to affirm the constitutionality of the statute.[35] The plurality announces that it is a "majority" on the issue of jurisdiction. That would be true only if its decision were to uphold the constitutionality of L.B. 1161.

We understand the constitutional supermajority requirement to mean a statute cannot be declared unconstitutional unless at least five members of this court (1) conclude that they have jurisdiction to decide the case and (2) determine on the merits that the statute is unconstitutional. Otherwise, a statute could be declared unconstitutional by four judges who believe they have jurisdiction to decide the issue and one who does not.

---

[34] Neb. Const. art. V, § 2 (emphasis supplied).

[35] See, e.g., *State v. Cavitt*, 182 Neb. 712, 157 N.W.2d 171 (1968).

Or, under the plurality's reasoning, the constitutionality of a statute could be upheld by three judges who do not believe they have jurisdiction to decide the issue but address the merits anyway, if there were four judges who held opposing views as to jurisdiction and constitutionality. Surely, the framers of the constitution did not intend such absurd results.

In our view, participating in what could be a binding opinion on the merits of a constitutional issue while at the same time opining that the court lacks jurisdiction to reach the constitutional issue would be judicially irresponsible and cast grave doubt upon the constitutional validity of the decision of the court. To the extent that the plurality analyzes the merits of the constitutional issue which it lacks the votes to resolve, its opinion is merely advisory. A more prudent course, and the one that we follow, is to refrain from addressing the constitutional issues which cannot be decided in this case because of our division on the jurisdictional issue of standing.

## CONCLUSION

In summary, we disagree with the plurality that the appellees, having failed to establish that they have traditional standing, may nevertheless have standing as resident taxpayers asserting a matter of "great public concern" without a showing that there are no better suited parties to assert such claims. Our established case law requires such a showing. In this case, it was not and cannot be made.

We conclude that the district court erred by not dismissing the action for lack of jurisdiction due to the failure of the plaintiffs below, the appellees herein, to establish standing. For the foregoing reasons, we respectfully dissent from the plurality's analysis of standing but concur in the result vacating the judgment of the district court.